

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-20-2000

# Black Horse Lane v. Dow Chem Corp

Precedential or Non-Precedential:

Docket 0-5031

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Black Horse Lane v. Dow Chem Corp" (2000). *2000 Decisions.* Paper 202.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/202

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 20, 2000

UNITED STATES COURT OF APPEALS
 FOR THE THIRD CIRCUIT

No. 00-5031

BLACK HORSE LANE ASSOC., L.P., a New Jersey limited
 partnership; UNITED STATES LAND RESOURCES, L.P., a
 New Jersey limited partnership; UNITED STATES REALTY
 RESOURCES, INC., a New Jersey Corporation; and
 LAWRENCE S. BERGER

v.

DOW CHEMICAL CORPORATION; ESSEX CHEMICAL
 CORPORATION, a wholly owned subsidiary of DOW
 CHEMICAL CORPORATION, a Michigan Corporation

Black Horse Lane Associates, L.P., United States Land
 Resources, L.P., United States Realty Resources, Inc. and
 Lawrence S. Berger,

        Appellants

On Appeal from the United States District Court
 for the District of New Jersey
 (D.C. Civ. No. 97-1250)
 District Judge: Honorable Nicholas H. Politan

Argued August 8, 2000

BEFORE: BARRY, WEIS and GREENBERG, Circuit Jud ges

(Filed: September 20, 2000)


        Paul H. Schafhauser (argued)
         Berger & Bornstein
         237 South Street
         P.O. Box 2049
         Morristown, N.J. 07960-2049

         Attorneys for Appellants

        Kenneth H. Mack (argued)
         Linda Mack
         Fox, Rothschild, O'Brien & Frankel
         997 Lenox Drive
         Princeton Pike Corporate Center,
         Building 3

Lawrenceville, N.J. 08648

Attorneys for Appellees

OPINION OF THE COURT

GREENBERG, Circuit Judge.

I. INTRODUCTION

This matter comes before this court on an appeal by plaintiffs United States Land Resources, L.P. ("USLR"), United States Realty Resources, Inc. ("USRR"), Black Horse Lane Associates, L.P. ("Black Horse"), and Lawrence S. Berger ("Berger") (collectively "appellants") from two orders entered by the district court in this matter: (1) the order entered August 10, 1999, granting a motion by appellees Dow Chemical Corporation ("Dow") and Essex Chemical Corporation ("Essex") for summary judgment pursuant to Fed. R. Civ. P. 56, and denying appellants' cross-motion for summary judgment on appellees' counterclaim; and (2) the "Final Order" entered December 16, 1999, affirming the June 30, 1999 order of the magistrate judge imposing sanctions against appellants, and dismissing appellees' counterclaim without prejudice for lack of subject matter jurisdiction. This litigation arises out of a sale of environmentally distressed real property located at 120 Black Horse Lane, South Brunswick, New Jersey (hereinafter "the Property"), by Essex to USLR.

2

For the reasons that follow, we will affirm the August 10, 1999 and December 16, 1999 orders of the district court in all respects.

II. FACTS and PROCEEDINGS

A. Factual Background

The historical facts in this case are rather straightforward and, insofar as material to this appeal, essentially are not disputed. Appellants, USLR, USRR, Black Horse, and Berger, are related entities: USLR is the general partner in Black Horse, USRR is the general partner of USLR, and Berger is the president of USRR.1 Appellees Essex and Dow also are related entities as Essex is Dow's wholly-owned subsidiary by virtue of its purchase of all of Essex's stock in 1988.

During the 1980s, Essex owned and operated the Property, where it engaged in the business of preparing

adhesive-backed paper products. On or about August 17, 1984, Essex discovered that chemicals it used in that process had leaked into the ground of the Property. In October 1984, Essex entered into environmental cleanup and decommission negotiations with the New Jersey Department of Environmental Protection ("DEP"). Essex submitted a "Clean-Up Plan" to the DEP on December 19, 1985, which the DEP conditionally approved on December 20, 1985.

Prior to Essex's submission of the Clean-Up Plan to the DEP, it entered into a sales agreement ("the Agreement") on September 5, 1985, with USLR to sell the Property to USLR for $3.6 million. The parties do not dispute that appellants were aware of the Property's environmental problems at the time that USLR and Essex entered into the Agreement. The Agreement required Essex to obtain and implement an approved Clean-Up Plan at its sole expense. Paragraph 16 of the Agreement set forth Essex's responsibilities with

_____

1. Also, Berger is a named partner in the lawfirm representing appellants.

3

respect to the remediation and detoxification of the Property:

> The parties acknowledge that the Subject Premises to be conveyed are subject to the provisions of the Environmental Clean-Up Responsibility Act, N.J.S.A. 13:1K-6 et seq. (`ECRA') [now named the Industrial Site Recovery Act (`ISRA')]. Seller agrees to obtain approval of a Clean-Up Plan from the Department of Environmental Protection (`DEP'), post the necessary financial security for performance pursuant to ECRA, will implement the approved Clean-Up Plan and complete the detoxification of the Subject Premises in accordance with and to the approval of the DEP. Pending DEP approval of a Clean-Up Plan, Seller will attempt to obtain the consent of the DEP to the conveyance of the Subject Premises. `ECRA Approval' will be deemed to have taken place upon the receipt by Seller from the DEP of the approval of the implementation of the Clean-Up Plan and satisfactory detoxification of the Subject Premises or a consent from the DEP to convey the Subject Premises to Purchaser in the form of an Administrative Consent Order and bond securing the detoxification of the Subject Premises by Seller, all in a form and substance satisfactory to Purchaser's mortgage lender. In no event

shall Purchaser be obligated under this Contract to assume any ECRA Clean-Up responsibilities. If ECRA Approval is not obtained prior to January 1, 1986, Purchaser shall have the continuing right to terminate this Contract by giving Seller notice at any time up to January 20, 1986. If ECRA Approval is not obtained by June 1, 1986, this Contract shall be automatically terminated and after the refund of the Deposit to Purchaser, neither party shall have any rights or claims against the other arising out of this Contract.

App. at 93a-94a. Title to the Property closed on December 23, 1985, three days after the DEP conditionally approved the Clean-Up Plan, and on that day USLR assigned its rights in the Property to its present owner, appellant Black Horse.

4

As previously mentioned, at some point in 1988, appellee Dow purchased all of Essex's stock, and Essex became a wholly-owned subsidiary of Dow. Since that time, Dow employees have been involved in the remediation and detoxification of the Property, but these Dow employees have been acting as "consultants" to Essex in that connection. SA at 546, 549.

Essex began its soil remediation efforts shortly after it sold the Property in 1985. While we are not able to ascertain the exact date of completion from the record, appellants' counsel confirmed at oral argument that soil remediation was finished within two years of the sale of the Property. See generally app. at 235a; SA at 536; appellees' br. at 17. Essex commenced groundwater remediation in 1988, app. at 236a, but, to date, it has not completed that remediation. It is Essex's alleged failure to complete remediation and detoxification of the Property within a "reasonable time" that forms the crux of the parties' dispute in this case.

One specific example that appellants cite as proof of Essex's alleged failure to remediate the Property within a reasonable time pertains to Essex's cleanup efforts with respect to certain "chlorinated volatile organic compounds" ("CVOCs") found in the soil and groundwater in certain areas of the Property.2 In 1991, the DEP ordered Essex to perform a "temporary well point survey" to investigate the presence and source of CVOCs found in the groundwater and soil gas. See app. at 304a. After Essex conducted extensive investigations into the source and levels of CVOCs found in the soil gas and groundwater, Essex proposed to remediate the areas of the Property

contaminated with CVOCs by means of soil vapor

_____

2. "CVOCs" is a shorthand reference to those volatile organic compounds
   that Essex used to clean the plant's adhesive-backed paper rolls.
   The CVOCs found on the northeastern and eastern portions of
   the Property include tetrachloroethylene, trichloroethylene, trans-1,2-
   dichloroethylene, and vinyl chloride. App. at 237a. Essex discovered
   trace amounts of CVOCs on the eastern and northeast corners of the
   Property in 1985, but the concentrations were so low that at that time
   DEP did not require Essex to address them. See  appellees' br. at 19;
   App. at 200a, 237a; SA at 553.

extraction ("SVE") technology, specifically, a "dual phase
 extraction system." App. at 307a. In May 1992, DEP
 approved this proposal. App. at 307a, 240a.

Notwithstanding DEP's approval of Essex's proposed
 system, Essex did not begin to install and operate the
 system immediately. Rather, from 1992 to 1997, Essex
 continued to investigate the source of the various CVOCs
 found on the Property, and conducted various tests at
 DEP's request. See app. at 238a-40a. This additional
 investigation required Essex to modify the SVE design,
 which requirement might account for the delay in its
 installation. App. at 240a. In any event, Essex completed
 its installation of the dual-phase extraction system in
 August 1997. We note, however, that Essex experienced
 some "start up" difficulties at the outset of its operation of
 the system. App. at 240a. Insofar as we can determine from
 the record, Essex is continuing its remediation efforts in
 connection with the CVOCs detected on the Property.

B. Procedural History

Appellants commenced this action in the district court in
 1997, and filed an amended complaint shortly thereafter.
 The amended complaint sets forth five causes of action
 against appellees Essex and Dow:3 (1) a claim based on a
 breach of Paragraph 16 of the sales contract as a result of
 Essex's failure to complete its cleanup of the Property
 within a "reasonable time", (count I);4 (2) a claim based on
 a breach of the implied covenant of good faith and fair
 dealing based on "defendants' " actions in connection with
 their cleanup efforts, (count II); (3) a claim for damages
 pursuant to section 107(a)(4)(B) of the Comprehensive
 Environmental Response, Compensation, and Liability Act
 ("CERCLA"), 42 U.S.C. S 9607(a)(4)(B), based on appellants'
 alleged expenditure of "necessary costs of response," and

_____

3. Inasmuch as the amended complaint refers to Essex and Dow collectively as "defendants" and asserts allfive claims against each entity, we refer to the defendants together as "appellees" unless otherwise noted.

4. The count does not use the term "reasonable time" but appellants contend that a reasonable time provision is implicit in the Agreement.

6

for declaratory and injunctive relief, (count III); (4) a claim for contribution for the costs of "clean-up and removal" and for injunctive and declaratory relief pursuant to the New Jersey Spill Compensation and Control Act, N.J. Stat. Ann. S 58:10-23.11 et seq. ("the Spill Act"), (count IV); and (5) a claim for "damages" based on appellees' breach of the Agreement "as well as the contamination with respect to the subject Property for which defendants are responsible," (count V). See app. at 67a. Appellees filed an answer to the amended complaint and a counterclaim seeking declaratory relief that remediation of the Property under Paragraph 16 of the Agreement included use of "engineering and institutional controls" and an order requiring appellants to consent to them. App. at 80a-81a.

The parties commenced discovery on November 7, 1997. Appellants designated Berger as their Fed. R. Civ. P. 30(b)(6) witness to testify on behalf of USLR, USRR and Black Horse. On October 2, 1998, appellees' counsel began to depose Berger, but counsel was not able to obtain a date to reconvene the deposition. As a result of counsels' inability to agree on the date that Berger's deposition should resume, appellees' counsel sought an order from the magistrate judge overseeing discovery to set the date for the resumption of the deposition. After a teleconference with the parties on October 6, 1998, the magistrate judge signed an order dated October, 9, 1998, which provided the following:

> IT IS on this 9th day of October, 1998, ORDERED, as follows:
>
> 1. Lawrence S. Berger, as Plaintiffs' Fed. R. Civ. P. 30(b)(6) designated witness and fact witness, shall appear for oral deposition commencing on Tuesday, October 13, 1998, at 10:00 a.m. and continuing from day to day thereafter until completed.

App. at 657a.

Notwithstanding the court's directive, when appellees'

counsel appeared at Berger's law office to continue his deposition on October 13, 1998, Berger failed to appear and his counsel, Paul Schafhauser, was "in trial" and not in the

office. SA at 60–61. At that point, appellees' counsel again sought the court's intervention.

On October 15, 1998, the magistrate judge signed and entered an order which directed that Berger's deposition recommence on Monday, October 19, 1998, at 10:00 a.m. App. at 660a. The order also provided that "[a]s a sanction for failure by Lawrence Berger to appear for depositions on Tuesday, October 13, Plaintiffs shall promptly pay the fees and costs of counsel fees for defendants (a) for appearing at Mr. Berger's non-deposition on October 13, and (b) for bringing this application and appearance today." App. at 660a. While Berger appeared for his deposition at the designated date and time, appellees claim that he provided evasive and non-responsive answers to many of counsel's questions relating to the negotiation and execution of the Agreement, and appellants' damages allegations. See generally app. at 540a–655a.

After the completion of discovery, the parties filed several motions germane to this appeal. First, appelleesfiled a motion for summary judgment pursuant to Fed. R. Civ. P. 56, seeking dismissal of the amended complaint in its entirety. Appellants opposed the motion, and filed a cross-motion for summary judgment on appellees' counterclaim for declaratory relief. In addition, appellees filed a motion before the magistrate judge for discovery sanctions pursuant to Fed. R. Civ. P. 37(b), (d), seeking to preclude appellants "from asserting, at trial, a position which differs from the testimony of their Rule 30(b)(6) witness." App. at 20a. Appellees also sought reimbursement of the attorney's fees and costs associated with Berger's deposition and their filing of the second sanctions motion.

The magistrate judge granted appellees' request for sanctions pursuant to Rule 37 by letter opinion and order entered June 30, 1999. Relying on Rule 37(b) and (d), he agreed that Berger's conduct warranted the sanction appellees requested, namely that appellants would be precluded from asserting a position and introducing evidence contrary to the positions Berger asserted during his deposition. The court also concluded that Berger's lack of preparedness at his deposition warranted the imposition of monetary sanctions pursuant to Rule 37(d) in the form of

costs and attorney's fees associated with taking the deposition and bringing the sanctions motion before the court. App. at 22a. Appellants filed an appeal from the magistrate judge's order to the district court.

In the meantime, after hearing oral argument on the cross-motions for summary judgment on June 28, 1999, see app. at 806a–831a, the district court granted appellees' motion on the amended complaint and denied appellants' cross-motion on the counterclaim by letter opinion and order entered August 10, 1999. Addressing appellees' motion first, the district court determined that dismissal of the amended complaint in its entirety was appropriate for several reasons, each of which we will discuss in greater detail in the discussion that follows.5

With respect to the breach of contract claim (count I), the court held that Paragraph 16 of the Agreement did not contain a provision requiring Essex to remediate the Property in a "reasonable time," and, given the commercial context in which the parties negotiated and executed the Agreement and appellants' subsequent conduct, the court should not imply that the contract had a reasonable time provision. See app. at 10a. Alternatively, it stated that even if it were to assume that there is an implicit "reasonable time" provision in Paragraph 16 of the Agreement,

_____

5. Before engaging in a substantive analysis of appellants' claims against Essex, the district court dismissed with prejudice all claims appellants asserted against Dow, reasoning that

> (1) plaintiffs' causes of action arise solely out of plaintiffs' contractual relationship with defendant Essex; (2) Dow and Essex are not related except to the extent that Dow acquired Essex's stock;
> (3) Essex is a responsible party and not insolvent; and (4) there is
> not even a scintilla of evidence that would justify piercing Essex's
> corporate veil.

App. at 7a n.1. Appellants assert that the district court erred in dismissing outright the claims against Dow, claiming that there are factual issues concerning whether it is a proper party in this suit. We will affirm the court's dismissal of Dow without further discussion as appellants' argument clearly is without merit. In any event, our affirmance of the summary judgment for Essex means that Dow cannot be liable to appellants.

appellants failed to adduce any evidence from which a reasonable jury could conclude that 14 years, i.e., from 1985 to the date of the district court's decision, was an unreasonably long time period to complete the type of detoxification and remediation called for in the Clean-Up Plan. App. at 11a. Turning next to appellants' claim based on the alleged breach of the implied covenant of good faith and fair dealing (count II), the court found that appellants failed to produce sufficient evidence that Essex acted in bad faith or engaged in misconduct that caused the delay in completing the cleanup of the Property. App. at 13a.

Third, the court dismissed the CERCLA and Spill Act claims for damages on the ground that appellants could not demonstrate that they incurred any compensable costs under either statute. The court pointed out that the only costs that appellants allegedly incurred were the fees they paid to their consultant, Enviro-Sciences, Inc. ("ESI"), but that such fees were not compensable under either the CERCLA or the Spill Act. App. at 15a. The court also denied appellants' request for injunctive and declaratory relief under CERCLA and the Spill Act, reasoning that declaratory relief was inappropriate because "plaintiffs have utterly failed to make any showing that they are likely to incur any future costs that will be recoverable" under either statute. It further found that injunctive relief was not warranted in view of the circumstance that Essex "is contractually and statutorily bound to detoxify the Property," and there was no evidence that Essex had breached the contract or violated CERCLA or the Spill Act. App. at 15a-16a. Next, the court dismissed count V, stating that "because plaintiffs have failed to adduce sufficient evidence in support of their breach of contract claims, they cannot recover the damages outlined in Count Five of the Complaint." App. at 16a.

Finally, the district court addressed and denied appellants' cross-motion for summary judgment on the counterclaim, noting that appellants "cite no authority in support of their motion," but "merely allege that `Plaintiffs do not and need not consent to any [engineering and institutional controls] with respect to the Property.' " Ultimately the court found that "[o]n the present record,

this Court is unable to say that the plaintiffs are entitled, as a matter of law, to a judgment dismissing defendants'

counterclaims."6 App. at 17a. The court's order stated that appellants' amended complaint was dismissed with prejudice.

After the district court ruled on the parties' dispositive motions, on or about August 13, 1999, the district court ordered the parties to file cross-motions with respect to Essex's counterclaim. App. at 775a. On December 13, 1999, the district court heard oral argument on the cross-motions, and also considered appellants' outstanding appeal from the magistrate judge's sanctions order. Ruling on the outstanding motions the district court (1) affirmed the magistrate judge's sanctions order, and (2) dismissed Essex's counterclaim against appellants without prejudice for lack of subject matter jurisdiction because the controversy set forth in the counterclaim was not ripe. See app. at 832a-49a. The district court then memorialized its record rulings in its "Final Order" entered December 16, 1999. App. at 23a. The monetary sanctions have been quantified and we understand that appellants have paid them.

Appellants filed a timely notice of appeal to this court from the district court's orders of August 10, 1999, and December 16, 1999. App. at 34a. The appellees do not cross-appeal from the dismissal of their counterclaim. We have jurisdiction pursuant to 28 U.S.C. S 1291.7 Of course, the fact that the dismissal of the counterclaim was without

_____

6. The court also addressed and denied appellees' motion for sanctions pursuant to Fed. R. Civ. P. 11. That aspect of the court's ruling is not in issue in this appeal, and we need not address it any further.

7. The district court exercised subject matter jurisdiction pursuant to 28 U.S.C. S 1331 inasmuch as count III of the amended complaint asserted a claim pursuant to CERCLA. The district court exercised supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. S 1367. We exercise plenary review over the district court's dismissal of appellants' amended complaint and the counterclaim, see Nelson v. Upsala College, 51 F.3d 383, 385 (3d Cir. 1995), and review the court's disposition of the sanctions issue pursuant to Rule 37 for an abuse of discretion. See General Ins. Co. of Am. v. Eastern Consol. Utils. Inc., 126 F.3d 215, 219 (3d Cir. 1997).

prejudice does not in the circumstances here deprive us of jurisdiction. See Presbytery of N.J. v. Florio , 40 F.3d 1454,

1461 (3d Cir. 1994); see also Erie County Retirees Ass'n v. County of Erie, 220 F.3d 193, 202 (3d Cir. 2000).

III. DISCUSSION

As is evident from our recitation of the procedural history leading to this appeal, appellants challenge several of the district court's rulings made during the proceedings in this matter. First, we will address the court's August 10, 1999 order dismissing the amended complaint. Then, we will review the district court's December 16, 1999 order dismissing appellees' counterclaim without prejudice, and affirming the magistrate judge's sanctions order.

A. District Court's Dismissal of
        the Amended Complaint

1. Breach of Contract Claim (Count I)

Appellants focus most of their attention on the district court's dismissal of their breach of contract claim pleaded in count I of the amended complaint. While recognizing that under New Jersey law, courts generally find that there is a "reasonable time" term implicit in contracts that do not set forth any time limitation for performance, the district court nevertheless held that "[i]n this case, the Court finds no justification for implying a `reasonable time' for performance because such a term is not `necessary to give business efficacy to the contract as written.' " App. at 8a. The court explained that "[a] main purpose of the Agreement, and the only purpose of Paragraph 16, was to require Essex to remediate the Property to the full satisfaction of the DEP and thereby make the land freely marketable." App. at 8a. The court found that "a `reasonable time' limitation is not necessary because Essex's performance under the contract--obtainingfinal DEP approval--must be evaluated solely by reference to the DEP." App. at 9a. Accordingly, the court stated that "such a contract simply does not lend itself to a reasonable time limitation." Id.

12

It also dismissed the breach of contract claim on the alternative ground that appellants presented insufficient evidence from which a reasonable jury could conclude that Essex breached its obligation to perform remediation and obtain DEP approval pursuant to the Clean-Up Plan within a "reasonable time." On this point, the district court held as follows:

    Plaintiffs allege that Essex has breached its contractual

obligation to complete the detoxification and obtain final DEP approval `within a reasonable time.' Therefore, to prevail, plaintiffs must show that a `reasonable time' has already expired. The Agreement was executed in 1985. This Court cannot say that fourteen years is unreasonable as a matter of law. In the context of an ISRA clean-up, which plaintiff Berger understood to be a `cumbersome' and `long' process, plaintiffs must adduce evidence that a `reasonable time' for completion of the clean-up is less then fourteen years. . . .

Such evidence might be in the form of reprimands or other statements from regulatory agencies like the DEP. Plaintiffs might also carry their evidentiary burden with expert testimony that, under the circumstances of this site and comparing it to other sites, fourteen years is an unreasonable length of time. In this case, however, plaintiffs have simply failed to adduce any evidence that fourteen years is unreasonable. The only evidence that even remotely addresses this issue is contained in plaintiffs' expert report. . . .

Giving plaintiffs the best of Mr. Cohen's report, `the environmental program undertaken on this site has been slow and ineffective in treating the contaminants that were release by Essex Chemical.' But evidence of a slow and ineffective clean-up process, without more, cannot reasonably support an inference that fourteen years is unreasonable.

App. at 11a-12a.

Appellants contend that the court erred in dismissing their breach of contract claim because, notwithstanding the

13

absence in Paragraph 16 of the Agreement of an explicit date by which Essex was to complete its cleanup of the Property and obtain DEP approval, by implication the Agreement requires Essex to fulfill its contractual obligations within a reasonable time. Appellants rely on the well-established principle of New Jersey law, which is applicable here on the contractual issues, that" `[w]here no time is fixed for the performance of a contract, by implication a reasonable time was intended.' " Br. at 41 (quoting, inter alia, Becker v. Sunrise at Elkridge, 543 A.2d 977, 983 (N.J. Super. Ct. App. Div. 1988)). They claim that the district court erred in concluding that the nature of this particular contract, and Essex's obligation with respect to

the remediation of the Property, rendered a "reasonable time" limitation unreasonable in the circumstances. Alternatively, they assert that at a minimum, there was a genuine issue of material fact as to whether the parties intended that Essex complete its remediation obligations within a reasonable time, thus precluding summary judgment in appellees' favor. Second, appellants contend that contrary to the district court's finding, they presented sufficient evidence from which a reasonable jury could conclude that Essex failed to remediate the Property within a "reasonable time."

Appellees respond that the district court correctly dismissed the breach of contract claim because appellants base their argument on the incorrect premise that Paragraph 16 omits a contractual provision which in turn requires the court to supply a "reasonable time" limitation. Br. at 36. They claim that contrary to appellants' construction of the contract, Paragraph 16 does contain a definite term for completion of the Property's remediation and therefore does not omit a contractual provision. In appellees' view the contract unambiguously provides the only term for completion that is reasonable in the circumstances--namely, that Essex's obligation is satisfied if the detoxification is undertaken "in accordance with and to the approval of DEP." Br. at 35–36. They claim that the district court correctly determined that it would be unreasonable to find that the Agreement included an implied reasonable time limitation, given the commercial context of the sale and purchase.

14

Appellees further assert that, in any event, even if we agreed with appellants that the district court should have implied a "reasonable time" limitation on Essex's remediation obligations pursuant to Paragraph 16, summary judgment was appropriate because there is no evidence that Essex breached its contractual obligations in that connection. They claim that the district court correctly determined that appellants failed to meet their burden of producing evidence demonstrating that as of the date that appellants filed their complaint in the district court, Essex had failed to remediate and detoxify the Property in accordance with the Clean-Up Plan, and obtain DEP approval of its efforts, within a reasonable time.

Appellees' protestations notwithstanding, we reject the district court's conclusion that a reasonable time provision was not implicit in Paragraph 16 of the Agreement. After all, New Jersey courts uniformly have applied the principle that "where no time is fixed for the performance of a

contract, by implication a reasonable time was intended."
See Becker, 543 A.2d at 983 (contract for sale of real
property); see also, e.g., River Dev. Corp. v. Liberty Corp.,
148 A.2d 721, 722 (N.J. 1959) (license to reclaim land must
be exercised within a reasonable time); Ridge Chevrolet–
Oldsmobile, Inc. v. Scarano, 569 A.2d 296, 300 (N.J. Super.
Ct. App. Div. 1990) (performance under real estate
contract); Mazzeo v. Kartman, 560 A.2d 733, 737 (N.J.
Super. Ct. App. Div. 1989) ("If the trial judge cannot
determine the parties' actual intent [concerning the
temporal limits of a right of first refusal], he should
determine a `reasonable time' for the expiration of the
right."); Ocean Cape Hotel Corp. v. Masefield Corp., 164
A.2d 607, 614 (N.J. Super. Ct. App. Div. 1960) (where
plaintiff claimed that defendant was obligated to make
certain repairs to property, if plaintiff 's claim had been
based on breach of contract, the court would have implied
a term that required completion of performance within a
reasonable time and would not have permitted parol
evidence that defendant promised repairs as of a certain
fixed date); McGraw v. Johnson, 126 A.2d 203, 206 (N.J.
Super. Ct. App. Div. 1956) (noting that performance under
contract must be completed within reasonable time where
claim was based on contractor's alleged failure to complete

15

building of home within a reasonable time); Curtis Elevator
Co. v. Hampshire House, Inc., 362 A.2d 73, 76 (N.J. Super.
Ct. Law Div. 1976) (performance under contract to install
elevators; where no specific date for completion was
provided in contract, court implied term requiring
completion within a reasonable time).

The district court predicated its analysis on statements in
New Jersey cases to the effect that terms are implied to
"give business efficacy to the contract as written." See app.
at 8a (citing McGarry v. Saint Anthony of Padua Roman
Catholic Church, 704 A.2d 1353, 1357 (N.J. Super. Ct. App.
Div. 1998)). But appellants argue persuasively that it would
be commercially unreasonable to construe the terms of
Paragraph 16 so as to permit Essex to begin its cleanup at
its leisure, and to continue its efforts in perpetuity without
the threat or even the slightest possibility of adverse legal
consequences flowing from inordinate delay. We also doubt
that the parties could have intended such a bizarre result.
See Onderdonk v. The Presbyterian Homes of N.J., 425 A.2d
1057, 1063 (N.J. 1981) ("Central to this inquiry of
ascertaining what, if any, terms are implied is the intent of
the parties. Intent may be determined by examination of
the contract and in particular the setting in which it was
executed.").

Nevertheless, notwithstanding our holding that a "reasonable time" term is implicit is Paragraph 16 of the Agreement, we agree with the district court's alternative basis for dismissing appellants' breach of contract claim, i.e., that a reasonable time period has not expired.8 We are mindful that "[w]hat constitutes a reasonable time under New Jersey law `is usually an implication of fact, and not of law, derivable from the language used by the parties considered in the context of the subject matter and the

_____

8. In view of our result appellees should understand that they do not have forever to complete the remediation and detoxification. To the contrary, they must diligently pursue their efforts to obtain the DEP approval within a reasonable time. Of course, it is not our intention by making this point to invite further litigation. We believe that if appellees are diligent in these efforts and keep appellants advised of the steps they are taking that the parties should be able to avoid additional judicial proceedings.

16

attendant circumstances, in aid of the apparent intention.' " Mazzeo, 560 A.2d at 737 (quoting Borough of West Caldwell v. Borough of Caldwell, 138 A.2d 402, 412 (N.J. 1958)). Nevertheless, appellants would bear the burden of proof on this issue at trial, to show that a reasonable time has expired, and to survive summary judgment, they must adduce evidence from which a reasonable jury could conclude that Essex breached its contractual obligation to complete its remediation and detoxification efforts within a reasonable time. Here, even viewing the facts in the light most favorable to appellants, we agree with the district court's assessment of the weakness of appellants' evidence as well as the court's conclusion that appellants failed to demonstrate that there was a genuine issue of material fact on the issue of whether Essex had breached its obligation to remediate the Property and obtain DEP approval within a reasonable time. Simply put, the record does not support the conclusion that appellants posit, i.e., that Essex breached its contractual duties to complete the remediation and detoxification efforts within a reasonable time.

For example, appellants first point to an Essex "Expense Appropriation Request" which indicated that the "completion date" of the entire project would be "1987."9 App. at 777a. But we do not share appellants' view that this evidence can support a conclusion that Essex breached Paragraph 16 of the Agreement. Obviously, the fact that

Essex estimated its completion date incorrectly does not support the conclusion that it has failed to cleanup the Property within a reasonable time. While a party's advance estimate of the time to complete a project might be persuasive evidence of the reasonable time for that undertaking, it is not in the circumstances here in which the scope of the project was so uncertain.

_____

9. According to the deposition testimony of Irwin Zonis, Essex's Chief Environmental Officer who was involved in the remediation and detoxification of the Property, the purpose of the Expense Appropriation Request was to notify Essex's financial department of the amount of funds deemed necessary for the completion of the project. He further explained that the document "told the financial department that the $320,000 would be expended by the end of 1987." App. at 189a.

17

Appellants also rely on the fact that in March 1986, shortly after the DEP approved Essex's Clean-Up Plan, Dr. Calvin J. Benning ("Benning"), Director of Environmental Affairs for Essex, wrote to the DEP questioning whether certain of the standards set forth in the Clean-Up Plan with respect to the contemplated soil remediation and whether the Clean-Up Plan's requirements were reasonable in the circumstances. App. at 225a-26a. For convenience, we will refer to this correspondence as Essex's "March 1986 letter." Appellants claim that the March 1986 letter was Essex's "attempt[ ] to circumvent the parameters and conditions" of its Clean-Up Plan, and that it demonstrates that Essex failed to proceed "reasonably and diligently" with the Property's detoxification. Br. at 46.

We cannot agree. The March 1986 letter questions the cleanup levels relating to the soil remediation which Essex completed within two years of the sale of the Property. See generally app. at 235a; appellees' br. at 17. Certainly if Essex also had completed the groundwater remediation within that period appellants would not have instituted litigation alleging a breach of Paragraph 16. Thus, inasmuch as appellants' breach of contract claim essentially is predicated on Essex's failure to complete groundwater remediation, we fail to see how this letter supports appellants' argument.

Similarly, appellants cite the fact that Essex did not begin groundwater remediation efforts until 1988 or remediation of the CVOCs until 1997. See br. at 47-48. However, appellants do not present evidence indicating that the delays were avoidable, and in any event, were unreasonable. Also they rely on the circumstance that

groundwater pumping "was frequently interrupted throughout the years," br. at 47, and that the DEP gave Essex a rating of "unacceptable due to `failure to operate the groundwater remediation system in the capacity it was designed.' " App. at 298a (emphasis added). But a review of the evidence in the record confirms that the interruptions Essex experienced are not a basis for holding that it unreasonably delayed its performance under Paragraph 16. To the contrary, intermittent delays are to be expected on a remediation project which cannot be compared to an

ordinary construction project built in accordance with fixed plans which is thus far less likely to encounter problems than a remediation undertaking. Moreover, as appellees correctly point out, the DEP's "unacceptable" rating did not relate to the length of time that Essex had expended on the remediation and detoxification of the Property. Rather, the DEP comments related to the need for Essex to implement a sufficient maintenance program so that it could manage the problems it had been experiencing with the wells more efficiently in the future. See app. at 298a. Thus, we cannot view the DEP's comments as tantamount to a statement that Essex was taking too long to finish the Property cleanup.

As the district court correctly observed, app. at 11a–12a, appellants' strongest evidence on this score is a statement by their environmental consultant, Irving Cohen of ESI. Cohen issued a report in which he opined that "the environmental program undertaken on this site has been slow and ineffective in treating the contaminants that were released by Essex Chemical." App. at 418a. In our view, however, this statement does not create a factual issue for the jury on the issue of unreasonable delay. Importantly, Cohen stops short of stating definitively that, given the circumstances, Essex had taken too long to complete its remediation and detoxification efforts. Moreover, even if he had stated such a conclusion it would not have an adequate foundation as he does not analyze specifically the types of contaminants involved in this project and the circumstances surrounding the remediation of this site. Nor does he compare Essex's efforts to other sites plagued with similar environmental contaminants. Given the vague nature of Cohen's conclusion, we agree with the district court's observation that "evidence of a slow and ineffective cleanup process, without more, cannot reasonably support an inference that fourteen years is unreasonable." App. at 12a.

When boiled down to its essence, appellants' argument is

that because the cleanup of the Property has taken longer to finish than the parties originally anticipated, Essex has breached Paragraph 16 of the Agreement as it has not completed the cleanup within a "reasonable time." While it

may be unfortunate that it has taken Essex an extended period of time to complete the cleanup of this Property, the delay does not support a conclusion that the amount of time it already has spent is unreasonable given the nature of Essex's contractual obligation. By appellants' own admission, the remediation and detoxification of the Property is a large effort which, by its very nature, is a lengthy and time-consuming process. Given the realities of the situation, appellants simply have failed to point to any evidence in this record demonstrating that the length of time that Essex has taken to detoxify the Property and obtain DEP approval is unreasonable in the circumstances. Accordingly, we will affirm the district court's dismissal the breach of contract claim.

2. Breach of the Implied Duty of Good Faith
       and Fair Dealing (Count II)

The district court also dismissed appellants' claim based on Essex's alleged breach of the implied duty of good faith and fair dealing, reasoning:

> In this case, plaintiffs allege only that Essex has failed to complete the clean-up process and obtain final DEP approval within a reasonable time. They point to no acts or omissions done in bad faith. There is no allegation, and certainly no evidence, that Essex has committed any misconduct. Summary judgment is therefore appropriate.

App. at 13a. Appellants claim that the district court erred in granting summary judgment on this claim because it ignored evidence from which a reasonable jury could conclude that Essex breached the implied duty of good faith and fair dealing during the course of its cleanup of the Property. Appellants point to the following evidence in support of their claim: (1) documents confirming that appellees "attempted to renege upon the standards set forth in the Clean-Up Plan"; (2) evidence showing that appellees "inexplicably failed to even begin remediation for many years after delineating contamination on the Property"; and (3) DEP documents reprimanding Essex for " `violations' and `unacceptable' progress." Br. at 49.

To be sure, "every contract in New Jersey contains an implied covenant of good faith and fair dealing." Sons of Thunder, Inc. v. Borden, Inc., 690 A.2d 575, 587 (N.J. 1997); see also Restatement (Second) of Contracts S 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."). "The implied covenant is an independent duty and may be breached even where there is no breach of the contract's express terms." Emerson Radio Corp. v. Orion Sales, Inc., 80 F. Supp.2d 307, 311 (D.N.J. 2000) (citing, inter alia, Sons of Thunder, Inc., 690 A.2d at 575); see also Bak-a-Lum Corp. v. Alcoa Bldg. Prods., Inc. , 351 A.2d 349, 352 (N.J. 1976).

The implied covenant of good faith and fair dealing requires that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Sons of Thunder, Inc., 690 A.2d at 587 (internal quotation marks omitted); Palisades Properties, Inc. v. Brunetti , 207 A.2d 522, 531 (N.J. 1965). A party to a contract breaches the covenant if it acts in bad faith or engages in some other form of inequitable conduct in the performance of a contractual obligation. See, e.g., Sons of Thunder, Inc., 690 A.2d at 589 (distinguishing prior decision in Karl's Sales & Service, Inc. v Gimbel Bros. Inc., 592 A.2d 647 (N.J. Super. Ct. App. Div. 1991), in which "there were no allegations of bad faith or dishonesty on the part of the terminating party" to the contract); Association Group Life, Inc. v. Catholic War Veterans, 293 A.2d 382, 384 (N.J. 1972) (stating that a contracting party breaches duty of good faith and fair dealing by engaging in behavior that was"not contemplated by the spirit of the contract and fell short of fair dealing"); Emerson Radio Corp., 80 F. Supp.2d at 311 ("The Restatement and the [New Jersey] cases note a state of mind or malice-like element to breach of good faith and fair dealing, holding that the duty excludes activity that is unfair, not decent or reasonable, nor dishonest."); Kapossy v. McGraw-Hill, Inc., 921 F. Supp. 234, 248 (D.N.J. 1996) (noting that courts "imply a covenant of good faith and fair dealing in order to protect one party to a contract from the other party's bad faith misconduct or collusion with third parties where there is no breach of the express terms of the

21

contract"); see also Restatement (Second) of Contracts S 205 cmt. a (noting that "[t]he phrase `good faith' is used in a variety of contexts, and its meaning varies somewhat with

the context" and explaining that "[g]ood faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving `bad faith' because they violate community standards of decency, fairness or reasonableness.").10

Section 205 of the Restatement (Second) of Contracts provides examples of the types of behavior that can give rise to a claim for breach of the implied duty of good faith and fair dealing in the context of one's performance under a contract:

> Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off , willful rendering of imperfect performance, abuse of power to specify terms, and interference with or failure to cooperate in the other party's performance.

Id. S 205 cmt. d (emphasis added).

Appellants' basic contention is that the circumstances of this case demonstrate that there is a genuine issue of material fact concerning Essex's lack of good faith in its

_____

10. Quite coincidentally this very panel on the same day that it heard argument in this case also heard argument in a case under Pennsylvania law involving the implied duty of good faith and fair dealing. See Northview Motors, Inc. v. Chrysler Motors Corp., No. 99-3873, 2000 WL 1273953, ___ F.3d. ___ (3d Cir. Sept. 8, 2000). Plainly, New Jersey law imposes a broader obligation on a party to a contract than Pennsylvania law to act in good faith in its performance. The parties, however, do not dispute that New Jersey law applies in this case, and we will decide the case on that basis.

22

performance of its obligation to remediate the Property and obtain DEP in accordance with Paragraph 16 of the Agreement. They claim that since the DEP approved the Clean-Up Plan in 1985, Essex has not performed its cleanup in a diligent manner, and in fact, has engaged in

bad faith conduct purposely to protract the process.
According to appellants, Essex's conduct has precluded
them from obtaining the fruits of their contract, i.e., a
property that is not environmentally distressed.

We cannot agree that the evidence in this case supports
the existence of a genuine issue of material fact on the
issue of Essex's good faith in its performance of its
obligation to remediate and detoxify the Property. In reality,
appellants' argument rests exclusively on their subjective
interpretation of the March 1986 letter in which Benning
set forth the following reservations as to whether certain
aspects of the Clean-Up Plan were reasonable in the
circumstances:

> The clean-up plan calls for the excavation and disposal
> of the contaminated soil to a level of 1 ppm, . . . based
> on the requirements of the case manager at BISE. I
> believe these levels are extremely low and not
> warranted. . . . We fully intend to remove the
> contaminated dirt from the former tank farm area. . . .
> However to satisfy BISE we are required to perform 15
> separate sample analyses in the laboratory instead of
> using a portable field analyzer to determine the extent
> of pollution and excavation, and to excavate to 1 ppm
> residual total VOC in the soil. I believe these
> requirements are both unreasonable and unwarranted.
> The clean up plan had to be approved by the end of
> 1985 and time was not available to question the
> requirement or to rationally discuss these points.
> However, the IAG discussion [which Benning attended
> on March 18, 1986] indicate [sic] that the[DEP] has
> also been rethinking some of their procedures and
> actions. I believe hexane and heptane are classified as
> hydrocarbon and I believe that a higher level than 1
> ppm is perfectly justified.

App. at 225a-26a. Appellants claim that this letter exhibits
Essex's lack of good faith and confirms that Essex

23

attempted to "renege upon the standards set forth in the
Cleanup Plan." Br. at 49; reply br. at 22-23.

While the letter questions whether the cleanup level of 1
ppm is warranted and whether lab analysis of soil samples
is necessary as opposed to Essex merely conductingfield
measurements of the soil, the letter does not demonstrate
a lack of good faith on Essex's part in performing its
obligations pursuant to Paragraph 16 of the Agreement.
First, as we previously mentioned, the letter discusses

Essex's obligations under the Clean-Up Plan relating to soil remediation, but appellants do not dispute that Essex has completed its soil remediation and detoxification efforts. In fact, appellants confirmed that Essex began its cleanup of the soil shortly after the sale, and that it completed soil remediation sometime within two years. Thus, we fail to see how this letter can demonstrate Essex's lack of diligence in that regard, or how Essex's conduct in questioning certain aspects of the Clean-Up Plan compromised appellants' right "to receive the fruits of the contract." See Sons of Thunder, Inc., 690 A.2d at 587 (internal quotation marks omitted).

Moreover, and perhaps more importantly, Benning wrote the March 1986 letter after he met with DEP officials and discussed the topic of appropriate cleanup levels in soil. The letter specifically states that the "IAG discussion on March 18 indicate [sic] that the department has also been rethinking some of their procedures and actions." App. at 225a. Thus, while the letter questioned the reasonableness of certain aspects of the Clean-Up Plan, Benning's comments indicate that he did so because of his previous discussions with DEP officials which apparently led him to believe that the DEP might no longer view some of its requirements as necessary or appropriate. Thus, when viewed in context, the letter does not indicate that Essex intended to renege on its obligation to cleanup the Property, and it does not indicate that Essex performed its contractual obligations with a lack of good faith.

In any event, Benning's concern over certain aspects of the Clean-Up Plan is of no consequence when we consider that less than two months later, he wrote a memorandum to Essex officials in which he recognized and re-emphasized

24

Essex's obligation to adhere to the requirements set forth in Clean-Up Plan. The memorandum states:

> Lately we have received letters from NJDEP and have discussed our program and permit applications with both state and local officials. These discussions have led to some very specific program requirements and items we must `keep in mind.'
>
> For example:
>
> 1. The NJDEP's ECRA office and the department of solid waste management have made it very clear that we must adhere to the Clean Up Plan .

App. at 227a.

Simply put, the fact that Benning questioned certain aspects of the Clean-Up Plan is not evidence that Essex acted in bad faith, as the DEP obviously responded to Benning's concerns by indicating that Essex was obligated to remediate the Property in accordance with the Clean-Up Plan, and Benning expressly reaffirmed Essex's intent to comply with its contractual and statutory obligations in that regard. Moreover, appellants do not demonstrate that Essex ever failed to implement a substantive remediation measure that the DEP required in connection with Essex's cleanup of the Property, and do not dispute that Essex completed soil remediation on the Property within two years of the sale. In our view, Benning's May 1986 memorandum reaffirming Essex's commitment to remediate the Property in accordance with the Clean-Up Plan belies appellants' assertion that the March 1986 letter evidences Essex's intent from the outset to conduct its remediation and detoxification efforts in "bad faith." Reply br. at 23. In the circumstances, we will affirm the district court's dismissal of appellants' claim that Essex breached the duty of good faith and fair dealing.

3. Appellants' CERCLA Claim (Count III)
        and Spill Act Claim (Count IV)

Count III of the amended complaint asserts a claim for damages and injunctive and declaratory relief pursuant to CERCLA, and count IV seeks the same relief pursuant to

25

the Spill Act. As previously mentioned, the district court dismissed the CERCLA claim, reasoning that appellants had not incurred any compensable "necessary costs of response" pursuant to section 107(a)(4)(B) of CERCLA. See 42 U.S.C. S 9607(a)(4)(B). In particular, the court explained that the only costs that appellants claimed to have incurred were the fees they paid to their environmental consultant, ESI. The district court found that those fees were not recoverable under CERCLA "because they had nothing to do with any effort by plaintiffs to detoxify the Property or to prevent or minimize the release of hazardous substances." App. at 14a (emphasis added). The district court explained that the fees were not recoverable because ESI merely reviewed the quarterly reports that Essex submitted to appellants and the DEP; ESI never visited the Property, monitored the contamination or the cleanup of the Property, or gathered data related to the investigation or remediation of the Property. The district court stated that "ESI's fees are those of an ordinary expert witness: the fees represent litigation costs, not environmental monitoring

costs." App. at 15a. Similarly, the court dismissed appellants' Spill Act claim seeking to recover ESI's fees because the fees "are unrelated to any prevention, mitigation, or remediation of contamination on the Property." App. at 14a.

The district court also denied appellants' request for a declaration that Essex is liable to appellants for any future costs pursuant to CERCLA or the Spill Act. The court stated that "[p]laintiffs have utterly failed to make any showing that they are likely to incur any future costs that will be recoverable under CERCLA or the Spill Act. Indeed, it is undisputed that Essex is contractually obligated to remediate the Property at its own expense." App. at 15a. Inasmuch as there was "no evidence--or even an allegation --that the plaintiffs intend to participate in future clean-up activities or incur any costs that might be recoverable under CERCLA," the court concluded that granting declaratory relief would be inappropriate.

Finally, the court denied appellants' request for an injunction compelling Essex to commence and complete the cleanup on the basis that there was no present case or

controversy. The court reasoned that "[t]here is no dispute that Essex is under both a contractual and statutory duty to detoxify the Property; nor is there any dispute that Essex has worked continuously to remediate the Property." The court further explained that "[i]n the absence of evidence that Essex has breached the Agreement or violated CERCLA or IRSA, there is no basis for the injunction that plaintiffs seek." App. at 16a.

On appeal from the CERCLA and Spill Act dispositions, appellants primarily claim that the district court erred in dismissing their CERCLA claim for monetary relief. 11 While

_____

11. We will address only briefly the several other issues appellants raise in connection with their CERCLA and Spill Act claims pleaded in counts III and IV of the amended complaint. Specifically, appellants maintain that the district court erred in rejecting their request for injunctive and declaratory relief pursuant to CERCLA, and in dismissing count IV of the amended complaint, their Spill Act claim. First, appellants contend that they are entitled to declaratory relief under CERCLA even if they have not incurred any compensable response costs as of yet, "[p]articularly [because] in light of the inexplicable lack of progress by Defendants in detoxifying the Property to date, Plaintiffs may well be forced to incur

future response costs to complete [the] detoxification. . . ." Br. at 52 (citing Bowen Eng'g v. Estate of Reeve, 799 F. Supp. 467, 476 (D.N.J. 1992), aff 'd, 19 F.3d 642 (3d Cir. 1994) (table)). They also state generally that injunctive relief pursuant to CERCLA is appropriate in the circumstances, but fail to explain the reason for their position on that point. See id.

We reject appellants' arguments in their entirety. First, appellants have not presented any evidence with respect to their request for a declaratory judgment as to future response costs under CERCLA demonstrating that such relief is appropriate. Given our discussion in the text that follows, it is clear that appellants have not incurred any response costs to date, and it is undisputed that Essex, rather than appellants, is bound contractually to complete the cleanup of the Property and obtain final DEP approval. Thus, there is nothing in the record suggesting that appellants ever will incur response costs, and there is no potential for injury that is "sufficiently immediate and real" so as to warrant declaratory relief pursuant to section 113(g)(2) of CERCLA, 42 U.S.C. S 9613(g)(2). See Kelley v. E.I. DuPont de Nemours & Co., 17 F.3d 836, 845 (6th Cir. 1994) (internal quotation marks omitted); see also United States v. USX Corp., 68 F.3d 811, 819 (3d Cir. 1995) (quoting statement in Kelly, 17 F.3d at 844, that " `[i]n providing for the recovery of response

27

appellants have not set forth their CERCLA argument in any detail, we understand they predicate it on a belief that they are entitled to recover the amounts paid to appellants' environmental consultant, ESI, as "necessary costs of response" pursuant to section 107(a) of CERCLA, because those "oversight costs" fall within the scope of either

_____

costs, Congress included language [in section 113(g)(2)] to insure that a responsible party's liability [for response costs], once established, would not have to be relitigated. . . .' ") (emphasis added)); The Southland Corp. v. Ashland Oil, Inc., 696 F. Supp. 994, 999 (D.N.J. 1988) ("To be granted a declaratory judgment on the issue of liability, . . . plaintiff[ ] must establish four factors to satisfy the requirements of section 107(a)," including "that, as a result [of defendants' conduct], [plaintiff] has incurred response costs."); compare Bowen Eng'g, 799 F. Supp. at 476 (stating that "[O]nce some expenditure [for response costs] has been

made, the controversy is sufficiently real to permit the court to issue a declaratory judgment on defendant's liability.") (internal quotation marks omitted). Second, appellants' vague assertion that injunctive relief is appropriate in this case, without any further elaboration on that point, is unconvincing.

Finally, we agree with the district court's disposition of the Spill Act claim seeking both monetary and equitable relief. While we have considered appellants' argument on this score, which essentially consists only of a citation to T&E Industries, Inc. v. Safety Light Corp., 587 A.2d 1249 (N.J. 1991), we fail to see how the case is germane here because it did not present claims under the Spill Act. In any event, after reviewing the applicable statutory provisions and case law on point, we are convinced that the district court did not err in dismissing count IV. Accordingly, we will affirm the court's dismissal of the Spill Act claim without further discussion. See N.J. Stat. Ann. S 58:10-23.11b.d. (providing definition of "cleanup and removal costs" for purposes of Spill Act); id. S 58:10-23.11g.c.(1) (stating that responsible persons are "strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred") (emphasis added); compare Analytical Measurements, Inc. v. The Keuffel & Esser Co., 843 F. Supp. 920, 929-30 (D.N.J. 1993) (stating that costs of the initial soil and groundwater investigation, analysis of problems and alternatives, excavation of soil, removal of thefirst 600 tons of soil to Ohio, and design of a groundwater investigation plan were "clearly recoverable under the Spill Act since they are associated with the cleanup and removal of discharged hazardous substances"; court also noted that declaratory relief was appropriate because it would "resolve any uncertainties over who is responsible for future cleanups").

28

"removal" or "remedial" action as defined by section 101 of CERCLA, 42 U.S.C. S 9601(23), (24). See generally br. at 53 (citing United States v. Lowe, 118 F.3d 399, 401-02 (5th Cir. 1997), which held, contrary to our decision in United States v. Rohm and Haas Co., 2 F.3d 1265 (3d Cir. 1993), that EPA's costs incurred in oversight of the private party cleanup of site were compensable "response costs" pursuant to section 107(a) of CERCLA). Appellants state that the court erred in finding that ESI's fees were those of "an ordinary expert witness," inasmuch as"an `expert witness' is clearly required only in the context of litigation while, by contrast, Plaintiffs have been forced to retain and

utilize the expertise of ESI, an environmental consultant, for the past fifteen years due to the lack of progress made by Essex with respect to the Property's `detoxification.' " Br. at 53.

Appellants' argument thus raises the issue of whether ESI's fees are "necessary costs of response" for which appellants, as private parties, may recover in a suit pursuant to section 107(a)(4)(B) against Essex, the party indisputably responsible for the cleanup of the Property pursuant to the Clean-Up Plan approved by the DEP. To answer that question, we must ascertain the character of the costs in question, and determine whether they fall within the types of costs recoverable by an innocent party pursuant to section 107(a)(4)(B) of CERCLA.

We begin with the relevant statutory language. Section 107 of CERCLA, 42 U.S.C. S 9607(a)(4), provides that certain enumerated parties "shall be liable for .. . all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan; [and] . . . any other necessary costs of response incurred by any other person consistent with the national contingency plan. . . ." The statute defines "response" as "remove, removal, remedy, and remedial action," and states that these terms include "enforcement activities related thereto." See CERCLA section 101(25), 42 U.S.C. S 9601(25). It then defines "remove or removal" and "remedy or remedial action" as follows:

(23) The terms `remove' or `removal' means[sic] the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and

Emergency Assistance Act. . . .

(24) The terms `remedy' or `remedial action' means [sic] those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and

30

community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

Section 101(23)(24), 42 U.S.C. S 9601(23), (24) (footnotes omitted).

As we explained in United States v. Rohm and Haas Co., "[i]n general, removal actions are short term responses to a release or threat of release while remedial actions involve long term remedies." 2 F.3d at 1271. Here, while appellants fail to recognize explicitly the distinction between "removal" and "remedial" actions and do not attempt to place ESI's consultant fees in either category, given the character of the costs at issue we believe that if the activities involved here are included within the definition of "response costs," it is because they are "removal" rather than "remedial" actions.

Cf. id. (noting that the parties agreed that if the government's oversight activities were deemed "necessary costs of response," it would be because they were removal actions rather than remedial actions).

Although the district court believed that ESI's consulting fees are best characterized as those of an "ordinary expert witness," appellants contest that statement by indicating rather cryptically in their brief that ESI has been appellants' environmental consultant for "fifteen years with respect to the Property's `detoxification,' " and therefore contend that we cannot consider ESI to be an "expert witness" retained only for litigation purposes. While appellants fail to cite an applicable portion of the record in support of that statement, our review of the parties' submissions confirms that Cohen testified at his deposition that appellants had retained ESI as a consultant as early as 1987 or 1988. See SA at 527.

31

Nevertheless, based on our study of the record, exercising plenary review we conclude that the district court did not err in concluding that ESI's consulting fees for which appellants seek reimbursement were litigation-related expenses. Inasmuch as private parties may not recoup litigation-related expenses in an action to recover response costs pursuant to section 107(a)(4)(B) of CERCLA, see Key Tronic Corp. v. United States, 511 U.S. 809, 819-20, 114 S.Ct. 1960, 1967 (1994); Redland Soccer Club, Inc. v. Department of the Army, 55 F.3d 827, 850 (3d Cir. 1995), and appellants do not claim to have incurred any other costs which fall within the definition of "necessary costs of response," we agree with the district court's disposition of the CERCLA claim.

In Redland Soccer Club, we determined that the Redland plaintiffs' litigation costs, which included attorney's fees, health risk assessments and expert witness fees, were not "response costs" under any of the statutory definitions found in section 9601 of CERCLA. 55 F.3d at 849-50 & n.12 (citing, inter alia, Key Tronic Corp., 511 U.S. at 819, 114 S.Ct. at 1967, which held that litigation-related attorney's fees were not recoverable in a private response cost recovery action). In reaching our result, wefirst observed that "under section [107], plaintiffs may only recover response costs which are necessary and consistent with the [National Contingency Plan]." Id. at 850. Second, we found that "[t]he heart of these definitions of removal and remedy are `directed at containing and cleaning up hazardous releases.' . . . [T]herefore[,] . . . `necessary costs of response' must be necessary to the containment and

cleanup of hazardous releases." Id. (quoting United States v. Hardage, 982 F.2d 1436, 1448 (10th Cir. 1992) (alteration in original) (internal quotation marks omitted)). Given that the costs incurred were all litigation-related expenses unrelated to any remedial or response action at the property itself, we stated that "we do not believe the district court erred in determining that plaintiffs' costs are not response costs because they are not `monies . . . expended to clean up sites or to prevent further releases of hazardous chemicals.' " Id. (quoting Redland Soccer Club, Inc. v. Department of Army, 801 F. Supp. 1432, 1435 (M.D. Pa. 1992), aff 'd in relevant part, 55 F.3d 827 (3d Cir. 1995)).

Here, as in Redland, the record required the district court to reach its conclusion that the costs for which the parties involved were seeking reimbursement were litigation-related expenses, and thus do not fall within the definition of "necessary costs of response." We first point out that, notwithstanding appellants' use of ESI's services prior to the commencement of this litigation, the billing statements that appellants submitted as proof of the amounts expended for ESI's service were for "consulting fees." Importantly, the billing statements cover services that ESI rendered in connection with the Property intermittently from November 1996 to May 1998. See SA at 1-17. Obviously, inasmuch as appellants filed their complaint in the district court in March 1997, appellants are seeking reimbursement for consulting services rendered just prior to the time that they commenced this litigation, as well as reimbursement for services during the duration of the proceedings in the district court. The timing of the transactions demonstrates that the district court correctly concluded that ESI performed consulting services in anticipation of appellants instituting this litigation, and also performed consulting work during the pendency of this litigation.

In this connection, we find it significant that Cohen prepared an expert report for purposes of this litigation on behalf of ESI for appellants dated April 28, 1998, see app. at 412a, and that ESI correspondingly recorded a significant charge on its billing statement to USLR for that billing period. See SA at 13. The only reasonable inference we can draw from these circumstances is that the "consulting fee" that appellants paid to ESI for that time period represented, at least in significant part, ESI's payment for its preparation of the expert report.

Second, we note that the record reflects, and it is not disputed, that as appellants' environmental consultant,

ESI's responsibilities were limited to reviewing Essex's quarterly reports it submitted to the DEP, and to providing appellants with a summary or analysis of Essex's progress in completing its remediation and detoxification efforts in accordance with the approved Clean-Up Plan. See app. at 466a; see also SA at 527. Indeed, ESI was not involved in

Essex's cleanup effort; it neither performed an investigation of the Property nor gathered data for that purpose. In our view, the nature of Essex's responsibilities toward its clients as described in the record thus confirms that it was retained to assess, for litigation purposes, whether Essex was complying with its contractual responsibility to cleanup the Property pursuant to the requirements set out in the Clean-Up Plan.

Moreover, it is relevant to our analysis that Berger's deposition testimony, as appellants' designated Rule 30(b)(6) witness, is far from illuminating on the necessary costs of response issue. Contrary to the spirit of Rule 30(b)(6), Berger's evasive answers provide us with little assistance in determining the exact purpose for which appellants retained ESI, the nature of ESI's services that are referenced cryptically in the billing invoices in the record, and whether the costs incurred in relation thereto were the result of litigation-related consultation or were incurred in connection with work performed for some other purpose. Berger's responses clearly do not suggest that ESI's consulting fees were anything other than expenses incurred in connection with the lawsuit that appellants eventually might file if they were not satisfied with Essex's progress (and ultimately did file) against appellees. We only need cite the following colloquy between Essex's counsel and Berger, which occurred at his deposition, to illustrate our point:

> Q: [Referring to the invoices for ESI] Mr. Berger, have you ever seen those bills before?
>
> A. I have no idea.
>
> Q. Well, then look through them.
>
> A. I could look through them for the next five hours and I would have no idea. We've 90 properties. I get bills from people. There are bills going into 1997 and before. I have no idea whether I have ever seen these bills or any other bills you might put in front of me today.

Q. Mr. Berger, other than the charges represented in those bills, are there any other costs that have been

expended by any plaintiff for any environmental consulting or removal or remediation with respect to the Black Horse Lane property?

A. I have no idea.

Q. Do you know a man named Mr. Irving Cohen?

A. Yes.

Q. How long have you known him?

A. I would say about ten years.

Q. And in what capacity do you know him?

A. Mr. Cohen was the president of Enviro-Sciences. It's an environmental consulting firm.

Q. Has that firm ever been used by [appellant] Black Horse Lane Associates?

A. I have no idea.

Q. Looking through the exhibits, if you could, could you tell me whether those bills appear to indicate that such was the case?

A. These bills are--at least the ones that I can see here --are from Enviro-Sciences, Inc. They reference Essex Chem, and I will tell you that every one references Essex Chem, except for those that reference Black Horse Lane, which is the subject property of this lawsuit. Other than that, I can't tell you anything about these bills. All I'm doing is reading from the bills for you.

Q. Turn to the bills that talk about Black Horse Lane, Phase One, I believe.

A. There's a bill dated 10-16-97 that says `Phase One, Black Horse Lane.'

Q. All right. To what does that bill refer?

A. I don't understand the question.

Q. What does Phase One, Black Horse Lane refer to?

A. I have no idea.

35

Q. Did you ever order a Phase One on Black Horse Lane?

A. I have no idea.

Q. Do you have an understanding what the phrase `Phase One' means?

A. Yes, I do.

Q. What is that?

A. It's a preliminary environmental report which basically points out areas of potential environmental concern.

Q. Does it include any invasive testing, as far as you know?

A. Typically, no.

Q. Do you have any idea why Black Horse Lane would have ordered a Phase One at or about the time period for which the bill is indicated?

A. Sitting here today, I have no idea why we did or didn't. I suspect if we did, in fact, order one a year ago, at that point I had a reason for it, but I don't know what that reason would be sitting here today. If, in fact, we did order a Phase One. I don't recall that either.

App. at 544a. Our review of the remainder of Berger's deposition testimony regarding the nature of ESI's consulting work for appellants confirms that he failed to offer any useful information concerning the factual basis for appellants' CERCLA response cost claim relating to the fees paid for ESI's services. See generally app. at 544a-49a.

Given the totality of the information in the record, we agree with the district court's assessment of the nature of ESI's consulting responsibilities to its client during the time period for which appellants seek reimbursement. We believe that the record requires the conclusion that ESI's work was designed to assess, for potential or actual litigation purposes, the extent of Essex's remediation efforts and its

progress in that regard. Accordingly, ESI's consulting fees charged in connection with its services are not"response

costs" that are recoverable in a private cost recovery suit pursuant to section 107(a)(4)(B) of CERCLA.12

In any event, assuming arguendo that we were to accept appellants' position that ESI's consulting fees were not for strictly "litigation costs" in the sense that appellants retained ESI's services during the relevant time period solely to assist them in preparing to litigate this matter, we nevertheless would reach the result we do, primarily for two reasons. First, appellants cannot reasonably deny that the record demonstrates that ESI's role was limited to evaluating Essex's progress on the cleanup effort and to reporting its progress (or lack thereof) to appellants. Indeed, it is significant that neither appellants nor ESI have played any role in the containment and cleanup of the Property. At best, it appears that ESI served as appellants' environmental advisor in relation to the Property, and that appellants simply monitored, for their own benefit, Essex's progress in its cleanup efforts. Given that neither ESI nor appellants were involved in any capacity in the actual environmental cleanup of the Property, it is clear that the fees appellants paid in connection with ESI's consulting work did not relate to any remedial or response action at the Property. As in Redland, the funds for which appellants seek reimbursement were not "necessary to the containment and clean up of hazardous releases," see Redland, 55 F.3d at 850 (emphasis added), inasmuch as appellants simply had no involvement in any remedial or removal actions on the Property. Cf. Key Tronic Corp., 511 U.S. at 820, 114 S.Ct. at 1967 (stating that "some lawyers'

_____

12. Again, we have not overlooked the circumstance that there are references in the record to the fact that Cohen performed some undefined environmental work for appellants prior to the dates found on the billing invoices in the record. See, e.g. , app. at 546a (Berger testifying
that he had a "general recollection" that Cohen of ESI performed "environmental work" for Black Horse Lane Associates prior to February 14, 1997). Nevertheless, as we previously stated, the invoices submitted indicate that the environmental consulting for which appellants seek reimbursement in this cost recovery claim began in November 1996 and continued intermittently through May 1998. Thus, while it appears that ESI performed work for appellants prior to its work for which they seek reimbursement, that fact is irrelevant inasmuch as appellants only seek reimbursement for those amounts listed on the billing invoices.

work that is closely tied to the actual cleanup may constitute a necessary cost of response in and of itself under the terms of S 104(a)(4)(B)," andfinding that the component of claim that covers attorneys' work in identifying other potentially responsible parties fell within that category).

Second, inasmuch as ESI's role was limited to reviewing the manner in which Essex was performing its legal obligation to remediate the Property and reporting Essex's progress to appellants, we think it fair to characterize ESI as an "overseer" of Essex's progress on behalf of appellants. But our decision in Rohm & Haas precludes appellants from recovering such "oversight" costs as"response costs" pursuant to section 107(a)(4)(B) of CERCLA. In Rohm & Haas, we held that the EPA could not recover from the statutory responsible party the cost of its "oversight" of the remedial actions performed and paid for by the private party. See 2 F.3d at 1278. The oversight costs the EPA incurred there included "direct costs (i.e. , hiring contractors to provide sampling support and field investigation) and indirect costs (i.e., travel costs, payroll, hiring contractors to review [defendants'] work"). Id. at 1269 n.4 (emphasis added). We stated that the "key issue" was whether CERCLA's definition of "removal" should be read "to encompass the government's activity in overseeing a removal or remedial action paid for and conducted by private parties." Id. at 1275.

In reaching our conclusion, we looked to the definition of "removal" found in section 101(23) of CERCLA, and noted that "[n]owhere in the definition of removal is there an explicit reference to oversight of activities conducted and paid for by a private party." Id. at 1275. Moreover, we reviewed the five categories in the definition of removal, with particular focus on the third of the five, i.e., "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances," as the EPA argued that it was that aspect of the definition that applied to permit recovery of the oversight costs it sought. In analyzing this language, we rejected the EPA's argument that it supported the relief requested, explaining our holding as follows:

Examined in a vacuum, this language could be understood to encompass at least some oversight of the

activities of a private party, particularly private activities focusing on assessment of the risk. On the other hand, it is at least as plausible to read this language as referring only to actual monitoring of a release or threat of release rather than oversight of the monitoring and assessment activities of others. This latter reading would be consistent with an understanding of the definition that distinguishes at all stages--assessment, response formulation, and execution--between actions taken to define the scope of the risk created by a release or threatened release and actions taken to evaluate the performance of others to determine whether they are meeting their legal obligations. We believe a reading of the statutory definition that embraces this distinction is linguistically the more plausible one.

Id. at 1275-76. We further concluded that"[a]ll things considered, we cannot say that clause [3] of the removal definition is sufficient to constitute the clear statement of intent required by [National Cable Television Ass'n, Inc. v. United States, 415 U.S. 336, 342, 94 S.Ct. 1146, 1149-50 (1974) ("NCTA")]."13  Id. at 1276.

_____

13. Obviously, we premised our result in Rohm & Haas on our application of the NCTA doctrine, which we believed required the EPA to demonstrate "a clear statement of congressional intent" for it to recover the oversight costs as response costs. See 2 F.3d at 1273, 1276. But our application of the NCTA doctrine does not undermine our reliance on our statutory interpretation analysis in Rohm & Haas  as germane here. Plainly put, we reach our result because the language of the relevant statutory provisions requires that we do so. Indeed, the only plausible basis for finding that appellants' oversight actions through ESI are "removal" activities is if they fall within the third category of "removal" actions, i.e., actions "necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances." But as we explained in Rohm & Haas, this language plainly refers to actual monitoring, assessment or evaluation "of a release or a threat of release." Id. at 1275 (emphasis added). Here, ESI's oversight activities, to the extent that we are willing for the sake of argument to deem them monitoring, assessment or evaluation activities, were not related to the release or threat of release of hazardous substances. Rather, the object of ESI's reports, insofar as we can tell from the record, was to analyze Essex's removal activities, including its cleanup, disposal, monitoring and assessment actions, as described in its quarterly reports to the DEP.

39

Our interpretation of the removal definition as excluding the sort of "oversight" costs that the EPA sought in Rohm & Haas compels the conclusion that appellants cannot recover the funds paid to ESI for its consultant work, even though appellants are private entities rather than a governmental agency. As in Rohm & Haas, appellants seek reimbursement from Essex, the responsible party, for costs appellants incurred in monitoring the responsible party's compliance with its legal obligations. See Rohm & Haas, 2 F.3d at 1279 n.23 ("The oversight costs here held to be non-recoverable are incurred at a different level of supervision. They are the costs of overseeing the performance of the entity that has assumed responsibility for the cleanup."). Indeed, there is no dispute in this case that Essex is bound contractually to complete remediation and detoxification of the Property, and that appellants have not assisted Essex in meeting its statutory and contractual obligations. In this sense, then, the district court was correct in its observation that the costs for which appellants seek reimbursement were not incurred as a result of appellants' actions in cleaning up the Property.

Obviously then, inasmuch as our holding in Rohm & Haas precludes the EPA from seeking reimbursement for "oversight" costs incurred in overseeing the performance of a private entity where a private party has assumed responsibility for the cleanup, an analysis of the scope of the "removal" definition necessarily requires us to reach the same result in a situation where a private party seeks reimbursement for overseeing another private party's legal obligation to cleanup a property. In short, we are satisfied that Congress did not intend section 107(a)(4)(B) to provide a private party with a cause of action against a responsible party for reimbursement of the party's expenses in retaining an environmental consultant for oversight purposes without direct involvement in the responsible party's remediation and detoxification efforts.

In sum, we are convinced that the district court correctly determined that appellants could not recover, pursuant to section 107(a)(4)(B) of CERCLA, the monies they expended in consulting fees in connection with ESI's services during the relevant time period. We will affirm the district court's

40

dismissal of appellants' private cost recovery action pleaded in count III of the amended complaint.14

B. District Court's Final Order of December 16, 1999

Appellants next contend that the district court erred in affirming the magistrate judge's letter opinion and order entered June 30, 1999, which granted appellees' motion for discovery sanctions against appellants pursuant to Rule 37(b) and (d).15 As we previously mentioned, the magistrate

_____

14. We also will dismiss appellants' Spill Act claim under Count IV. See n.11, supra. Moreover, as we previously mentioned, count V of the complaint pleaded a claim for "damages" stemming from appellees' alleged "acts, omissions and breaches." App. at 66a. The district court dismissed this count, stating that "[b]ecause plaintiffs have failed to adduce sufficient evidence in support of their breach of contract claims, they cannot recover the damages outlined in Count Five of the Complaint." Id. at 16a. Inasmuch as we agree with the district court's dismissal of counts I through IV of the complaint, we will affirm the district court's dismissal of count V, as there is no independent substantive basis for appellants' claim for relief.

15. Appellants also maintain that the district court erred in dismissing appellees' counterclaim without prejudice. The counterclaim sought a declaratory judgment that remediation of the Property under the Agreement included use of "engineering and institutional controls," and an order requiring appellants to consent to them. App. at 80a–81a. Appellees explain that their counterclaim actually sought an order compelling appellants to consent to their use of a Classification Exception Area ("CEA"), which is "a remediation by passive rather than active means." App. at 845a.

As we previously mentioned, appellants initially sought partial summary judgment to dismiss the counterclaim with prejudice, but the district court denied their motion in its order of August 10, 1999, reasoning that appellants failed to demonstrate that they were entitled to judgment as a matter of law. The court observed that appellants failed to cite any authority in support of the motion, and"merely allege[d] that `Plaintiffs do not and need not consent' to the engineering and institutional controls." App. at 16. After the court dismissed the amended complaint in its entirety, appellees moved for summary judgment on the counterclaim. After oral argument on appellees' motion, the court entered an order dismissing the counterclaim without

41

judge agreed with appellees' argument that Berger's conduct warranted a sanction in the form of precluding appellants from asserting a position and introducing evidence contrary to the position Berger asserted during his deposition. In addition, the magistrate judge concluded that

Berger's lack of preparedness at his deposition justified the imposition of monetary sanctions pursuant to Rule 37(d) in the form of costs and attorney's fees associated with taking the deposition and bringing the sanctions motion before the court. App. at 22a. The magistrate judge clearly set forth the factual and legal basis for his ruling, relying primarily on the Court of Appeals for the Fifth Circuit's decision in Resolution Trust Corp. v. Southern Union Co., 985 F.2d 196 (5th Cir. 1993) ("Southern Union"):

> Here, Berger was not completely prepared on any
> occasion for which he sat for a deposition. Further, his

_____

prejudice, because, in its view, there was no current case or controversy with respect to the subject matter of the counterclaim.

We have reviewed the entire record, and we agree with the district court's disposition of the counterclaim. It appears that the appellees instituted the counterclaim in response to certain statements by appellants to the effect that they would not consent to the use of a CEA to remediate the Property, and would oppose any application that Essex made to the DEP for that purpose. Appellees' br. at 14. Nevertheless, the court's dismissal of the counterclaim was appropriate because appellees do not dispute that Essex has not applied for a CEA, and presently cannot do so. Accordingly, appellants' threats to the effect that they would not consent to the use of a CEA do not present a controversy ripe for resolution, and the court did not err in dismissing the counterclaim without prejudice for lack of subject matter jurisdiction. See, e.g., Philadelphia Fed'n of Teachers v. Ridge, 150 F.3d 319, 323 (3d Cir. 1998) (discussing and applying ripeness doctrine in context of claims seeking declaratory relief, and noting that "[t]he function of the ripeness doctrine is to prevent federal courts, `through avoidance of premature adjudication, from entangling themselves in abstract disagreements.' ") (quoting Abbot Labs v. Gardner, 387 U.S. 136, 148, 87 S.Ct. 1507 (1967), overruled on other grounds, Califano v. Sanders, 430 U.S. 99, 105, 97 S.Ct. 980 (1977)); The Presbytery of N.J. v. Florio, 40 F.3d at 1462 (addressing ripeness issue in context of suit seeking declaratory relief and stating that "[i]t is the plaintiff 's responsibility to allege facts that invoke the court's jurisdiction").

42

> lack of preparation cannot be a mere oversight but is,
> instead, a clear demonstration of bad faith. This is
> obvious from Berger's repeated denial of any knowledge
> of his status as a 30(b)(6) witness despite being present
> at the deposition and being asked each and every time

he appeared if he had knowledge of his status. Further, Berger, as did the plaintiffs' witness in Resolution Trust Corp., even denied knowledge of documents which he himself had signed, claiming that he had no recollection of such documents despite acknowledging that he normally did not sign anything that he did not read first. These infractions would not be so detrimental if Berger were no so consistent with his apparent incompetence and lack of cooperation. Had he taken the time to prepare in the slightest as Rule 30(b)(6) requires, he might have been fully prepared for at least one deposition. Additionally, Berger's actions are magnified by his status as a member of the Bar.

App. at 21a.

In affirming the magistrate judge's order, the district court provided its reasons on the record:

I read the record. It is appalling. It is appalling.

[Berger] did nothing except show his face only under the threat of court orders. When he showed up, he knew he was a 30(b)(6) witness and, notwithstanding the fact that he knew he was a 30(b)(6) witness, he refused to answer questions in an intelligent way. He refused to prepare, as you are required to prepare under 30(b)(6), to intelligently answer questions and just literally thumbed his nose at the defendants and, frankly, at the Court.

. . . .

I'm satisfied, based upon my review of the record--and I defy anyone to look at the record here which was created by Mr. Berger--that the actions taken by[the magistrate judge] were well within his discretion and do not constitute either an abuse of discretion or are they contrary to law or shocking to the conscience of the Court.

43

One, in order to come to that conclusion, one must live in the shoes of [the magistrate judge] in trying to conduct orderly discovery in this matter.

One must review meticulously the record of noncompliance by Mr. Berger in this matter.

[The magistrate judge] did not issue this opinion lightly. [The magistrate judge] was fully cognizant of

the totality of the facts surrounding this matter, which
border upon almost conscious disregard of the Court
and the court rules. . . .

Affirmed.

App. at 836a, 843a-44a.

Appellants make two arguments in support of their
request to vacate the monetary sanctions order. 16 They first
claim that the district court abused its discretion in
affirming the magistrate judge's monetary sanctions
because the court misunderstood the requirements for

imposing sanctions pursuant to Rule 37(d). They assert
that Rule 37 required as a prerequisite to imposing a
monetary sanction that the court first issue an order
compelling appellants to supply the requested discovery
responses, and then find that they failed to do so. See
Reply Br. at 29. They further claim that pursuant to Rule
37(d), "a party making a motion based upon an alleged
violation of Rule 37(d) must certify that the movant has in
good faith conferred or attempted to confer with the party
failing to answer or respond in an effort to obtain such
answer or response without court action," but that there
was no such "good faith" effort by appellees to resolve the

_____

16. Appellants also claim that the court abused its discretion in
granting
appellees' motion pursuant to Rule 37(b) to the extent that it precluded
appellants from asserting at trial a position which differs from
Berger's
testimony. Given that we are affirming the summary judgment
dismissing the amended complaint in its entirety, we need not address
this argument. Also, appellants apparently contend that the court erred
in awarding a monetary sanction pursuant to Rule 37(b)(2). This
argument is without merit, as it is clear to us that the court awarded
attorney's fees and costs pursuant to subdivision (d) of Rule 37 rather
than subdivision (b). See App. at 22a (citing Rule 37(d)).

44

dispute without court action. Reply Br. at 30 (internal
quotation marks omitted).

Finally, they rely on the fact that Rule 37(d) states that
sanctions may be imposed when a party, inter alia, "fails
. . . to appear before the officer who is to take the
deposition, after being served with a proper notice." Here,
they argue that we should apply the "fails to appear"
language literally, and that sanctions were inappropriate in

this case because Berger appeared for his deposition after the magistrate judge's October 15, 1998 order and"testified under oath for more than seventeen hours." Br. at 59-60. In support of their literal reading of Rule 37(d), they rely primarily on the Court of Appeals for the First Circuit's opinion in R.W. International Corp. v. Welsh Foods, Inc., 937 F.2d 11 (1st Cir. 1991), which stated that "Rule 37(d) sanctions apply only when a deponent `literally fails to show up for a deposition session.' " Id. at 15 n.2 (quoting Salahuddin v. Harris, 782 F.2d 1127, 1131 (2d Cir. 1986)).

Their second argument is based on their interpretation of Berger's behavior during his deposition. They claim that even if we agree with the magistrate judge's finding that Rule 37(d) could support the imposition of sanctions when a Rule 30(b)(6) witness provides inadequate and evasive answers, the record demonstrates that Berger's deposition did not present a situation warranting sanctions. They claim that "[a] fair examination of the transcript of Mr. Berger's 570-page deposition confirms that Mr. Berger testified fully and in good faith in response to Defendants' questioning." In any event, they maintain that"any `violation' of Rule 30(b)(6) which might be said to have existed was minimal, and indeed, paled in comparison with the extraordinarily broad discovery obtained by Defendants in this matter." Br. at 63.

We are not persuaded by either contention. Beginning with appellants' interpretation of the language of Rule 37(d),17
_____

17. Rule 37(d) provides:

     (d) Failure of Party to Attend at Own Deposition or Serve Answers to
         Interrogatories or Respond to Request for Inspection. If a party or
     an
         officer, director, or managing agent of a party or a person designated

45

they simply are incorrect that the magistrate judge committed an error of law in awarding a monetary sanction to appellees. Initially, we point out that unlike subdivision (b) of Rule 37, on its face subdivision (d) does not require the court, prior to imposing sanctions, to have issued an order compelling discovery. See Al Barnett & Son, Inc. v. Outboard Marine Corp., 611 F.2d 32, 35 (3d Cir. 1979) ("[A] direct order by the Court, as Rule 37(a) and (b) requires, is not a necessary predicate to imposing penalties under Rule

37(d)."), repudiated on other grounds, Alexander v. Gino's Inc., 621 F.2d 71 (3d Cir. 1980); compare Fed. R. Civ. P. 37(b)(2) ("If a party . . . or a person designated under Rule 30(b)(6) . . . fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule . . . .") with Fed. R. Civ. P. 37(d) (stating that if the party fails, inter alia, to appear for a deposition, "the court . . . may make such orders in regard to the failure as are just"). Moreover, while appellants claim that subdivision (d)

_____

> under Rule 30(b)(6) or 31(a) to testify on behalf of a party fails (1) to appear before the officer who is to take the deposition, after being served with a proper notice, or (2) to serve answers or objections to interrogatories submitted under Rule 33, after proper service of the interrogatories, or (3) to serve a written response to a request for inspection submitted under Rule 34, after proper service of the request, the court in which the action is pending on motion may make such orders in regard to the failure as are just, and among others it may take any action authorized under subparagraphs (A), (B), and (C) of subdivision (b)(2) of this rule. Any motion specifying a failure under clause (2) or (3) of this subdivision shall include a certification that the movant has in good faith conferred or attempted to confer with the party failing to answer or respond in an effort to obtain such answer or response without court action. In lieu of any order or in addition thereto, the court shall require the party failing to act or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

> The failure to act described in this subdivision may not be excused on the ground that the discovery sought is objectionable unless the party failing to act has a pending motion for a protective order as provided by Rule 26(c).

requires the party seeking sanctions to certify in their motion papers that they conferred or attempted to confer in good faith with the party failing to answer or respond in an effort to avoid court intervention, subdivision (d) explicitly only requires such a certification where the motion specifies a failure "under clause (2) or (3) of this subdivision." Fed. R. Civ. P. 37(d). Here, appellees made the motion for sanctions based on clause (1) of subdivision (d), which deals with a party's failure "(1) to appear before the officer who is to take the deposition." Id.

In addition, while we recognize that the court's statement in Welsh Foods supports appellants' interpretation of the language of Rule 37(d)--namely that it requires an actual "no show" to satisfy the "fails to appear" requirement in subdivision (1)--they apparently have overlooked the circumstance that the magistrate judge's decision relied on Southern Union, 985 F.2d 196. Importantly, in Southern Union the Court of Appeals for the Fifth Circuit rejected a literal interpretation of Rule 37(d) in situations where the uncooperative deponent is a party's Rule 30(b)(6) designated witness.

In Southern Union the defendant Southern Union Co. ("Southern Union") served notice on the RTC that it intended to depose it pursuant to Rule 30(b)(6), and set forth with specificity ten discrete topics with which the deponent was to be familiar. After the RTC designated two individuals as Rule 30(b)(6) deponents, Southern Union's representatives traveled from Washington, D.C. to Dallas, Texas, to conduct the depositions. Neither representative, however, possessed any knowledge relevant to the matters designated in the Rule 30(b)(6) notice. Consequently, Southern Union moved for sanctions, and the district court granted the motion, awarding costs and fees incurred in deposing the RTC's two witnesses and in identifying ultimately the proper deponent with knowledge of the relevant facts. See id. at 196-97.

Relying upon the Court of Appeals for the Second Circuit's opinion in Salahuddin, a case cited subsequently in Welsh Foods, the RTC contended that sanctions pursuant to Rule 37(d) were not appropriate because both witnesses literally appeared for their depositions, albeit that

neither was helpful or forthcoming with pertinent information. The Court of Appeals for the Fifth Circuit

rejected that argument, reasoning:

> Were we here faced with a case involving the deposition of a natural person we might be inclined to agree with the reading of Rule 37(d) by our Second Circuit colleagues [in Salahuddin]. The deposition of a corporation, however, poses a different problem, as reflected by Rule 30(b)(6). Rule 30(b)(6) streamlines the discovery process. It places the burden of identifying responsive witnesses for a corporation on the corporation. Obviously, this presents a potential for abuse which is not extant where the party noticing the deposition specifies the deponent. When a corporation or association designates a person to testify on its behalf, the corporation appears vicariously through that agent. If that agent is not knowledgeable about relevant facts, and the principal has failed to designate an available, knowledgeable, and readily identifiable witness, then the appearance is, for all practical purposes, no appearance at all.

> In the instant case, RTC possessed documents that clearly identified [the eventual deponent] as having personal knowledge of the subject of the deposition. RTC did not furnish those documents or designate [that deponent] until after it had designated Perry and Wieting, obliged Southern Union's counsel to travel from Washington, D.C. to Dallas for a useless deposition, and been served with Southern Union's motion for sanctions. The finding that RTC did not make a meaningful effort to acquit its duty to designate an appropriate witness is manifest. The district court did not abuse its discretion in awarding fees and costs under Rule 37(d).

Id. at 197–98.

Following the reasoning in Southern Union, several courts similarly have read the phrase "fails . . . to appear" in Rule 37(d) pragmatically in light of the purposes of Rule 30(b)(6) and the parties' obligations thereunder. See, e.g., Starlight Int'l Inc. v. Herlihy, 186 F.R.D. 626, 639 (D. Kan. 1999)

48

("Corporations, partnerships, and joint ventures have a duty to make a conscientious, good-faith effort to designate knowledgeable persons for Rule 30(b)(6) depositions and to prepare them to fully and unevasively answer questions about the designated subject matter."); The Bank of New York v. Meridien Biao Bank Tanzania Ltd., 171 F.R.D. 135, 151 (S.D.N.Y. 1997) (" `Producing an unprepared witness is

tantamount to a failure to appear.' ") (quoting United States v. Taylor, 166 F.R.D. 356, 363 (M.D.N.C. 1996)); Taylor, 166 F.R.D. at 363 ("[I]nadequate preparation of a Rule 30(b)(6) designee can be sanctioned based on the lack of good faith, prejudice to the opposing side, and disruption of the proceedings."); Zappia Middle East Constr. Co. v. The Emirate of Abu Dhabi, No. 94-1942, 1995 WL 686715, at *8 (S.D.N.Y. Nov. 17, 1995) (agreeing with rule announced in Southern Union that providing a wholly inadequate witness may amount to non-appearance under Rule 30(b)(6), but finding that sanctions were not warranted in the circumstances of that case); Municipal Subdistrict, Northern Colo. Water Conservancy District v. OXY USA, Inc. , 990 P.2d 701, 710 (Colo. 1999) (en banc) (following Southern Union, 985 F.2d at 197, and holding that trial court may issue sanctions for failure to appear under Col. R. Civ. P. 37(d)--the state's analogue to Fed. R. Civ. P. 37(d)--when a corporation designates a deponent who appears but is unable to answer all the questions specified in the Col. R. Civ. P. 30(b)(6) notice); see also, e.g., Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 78-79 (S.D.N.Y. 1991) ("[A] party that fails to provide witnesses knowledgeable in the areas requested in a Rule 30(b)(6) notice is likewise subject to sanctions."); Thomas v. Hoffman-LaRoche, Inc., 126 F.R.D. 522, 525 (N.D. Miss. 1989) ("Sanctions are appropriate when a party fails to comply with a request under Rule 30(b)(6) to provide a knowledgeable deponent to testify on behalf of the organization."); see generally Boland Marine & Mfg. Co. v. M/V Bright Field, No. 97-3097, 1999 WL 280451, at *3 (E.D. La. May 3, 1999) (acknowledging the rule announced in Southern Union butfinding that deponent was prepared adequately and that sanctions were not warranted).

We agree with the distinction the Court of Appeals drew

49

in Southern Union, and find its analysis persuasive.18 In reality if a Rule 30(b)(6) witness is unable to give useful information he is no more present for the deposition than would be a deponent who physically appears for the deposition but sleeps through it. Indeed, we believe that the purpose behind Rule 30(b)(6) undoubtedly is frustrated in the situation in which a corporate party produces a witness who is unable and/or unwilling to provide the necessary factual information on the entity's behalf. See generally Fed. R. Civ. P. 30 advisory committee's notes (stating that the procedure outlined in subdivision (b)(6) should be viewed as "an added facility for discovery" and would "curb the `bandying' by which officers or managing agents of a corporation are deposed in turn but each disclaims

knowledge" of relevant facts). "For courts to permit litigants to disregard the responsibilities that attend the conduct of litigation would be tantamount to `encouraging dilatory tactics.' " Al Barnett & Son, Inc., 611 F.2d at 35 (quoting Cine Forty-Second Street Theatre v. Allied Artists Pictures Corp., 602 F.2d 1062, 1068 (2d Cir. 1979)). Thus, we hold that when a witness is designated by a corporate party to speak on its behalf pursuant to Rule 30(b)(6), "[p]roducing an unprepared witness is tantamount to a failure to appear" that is sanctionable under Rule 37(d). See Taylor, 166 F.R.D. at 363. Accordingly, we conclude that the district court did not commit an error of law in affirming the magistrate judge's sanctions order entered pursuant to Rule 37(d), as the magistrate correctly applied the Court of Appeals for the Fifth Circuit's construction, which we

_____

18. We point out that the cases appellants cite in addition to Welsh Foods in further support of their argument are equally unhelpful, as none of them involved a situation in which the uncooperative and/or unknowledgeable witness was a corporate entity's Rule 30(b)(6) designee. See, e.g., Estrada v. Rowland, 69 F.3d 405, 405-06 (9th Cir. 1995) (deponent was plaintiff pursuing action pursuant to 42 U.S.C. S 1983 against prison officials); Aziz v. Wright, 34 F.3d 587, 588-89 (8th Cir. 1994) (same); Salahuddin, 782 F.2d at 1131 (same); Stevens v. Greyhound Lines, Inc., 710 F.2d 1224, 1228 (7th Cir. 1983) (deponent was plaintiff in employment discrimination suit); SEC v. Research Automation Corp., 521 F.2d 585, 587 (2d Cir. 1975) (deponent was individual defendant and president of corporate defendant).

50

approve, of the phrase "fails . . . to appear" in Southern Union.

We reject appellants' final contention that Berger's responses during his deposition did not support the district court's finding that he failed to cooperate with appellees' attorneys, and that his conduct was tantamount to a failure to appear that warranted sanctions under Rule 37(d). To the contrary, our review of Berger's deposition testimony in its entirety confirms the observations of both the magistrate judge and the district court on this point. Indeed, throughout his lengthy deposition, Berger failed to offer meaningful testimony about most, if not all, of the items specified in the notice of deposition. While we need not recite every instance in which Berger's testimony was incomplete and unhelpful on the specified topics, we believe that two examples of his uncooperative attitude and his flagrant disregard for his obligation as a Rule 30(b)(6) witness amply illustrate our point.

First, when Berger was asked about the Agreement he signed between USLR and Essex, he stated that he had no recollection of (1) seeing or signing the Agreement, (2) negotiating the Agreement (or who participated in its negotiation), (3) drafting the various provisions in the Agreement (or who participated in its drafting), or (4) the circumstances surrounding the purchase of the Property, i.e., if he attended the closing and where it occurred, even though he admitted that he was personally involved in the purchase of the Property and "probably negotiated the contract." See app. at 525a. Second, when asked about any and all cleanup costs appellants' incurred as a result of the contamination on the Property, Berger testified that he did not know: (1) whether appellants spent any money to cleanup hazardous waste; (2) whether appellants performed any environmental evaluation or investigation on the Property, whether they incurred costs in doing so, and whether there are any records that such tests were performed; (3) whether appellants hired ESI to perform consulting services for the Property, and if so, the dates and purposes for which appellants retained ESI; (4) whether ESI's billing statements in the record reflected work performed on the Property or other unrelated services;

and (5) whether appellants performed any removal or remedial actions on the Property. App. at 521a, 523–25a, 544a–49a.

Obviously, as appellants' Rule 30(b)(6) witness, Berger should have been prepared to discuss these and other topics designated in the notice of deposition. Instead, he divulged as little information as possible in every area that appellees identified. Moreover, Berger's uncooperative attitude is demonstrated further by statements in which he claimed that he was unaware that he was appellants' designated Rule 30(b)(6) representative, did not know what the phrase "Rule 30(b)(6) representative" meant, and was not familiar with Rule 30(b)(6) or what it required him to do. App. at 513a–14a, 527a, 544a. He also admitted at one point that he did not recall whether he reviewed the notice of deposition prior to the date of the deposition, app. at 527a, and later stated clearly that he had not bothered to read it at all. App. at 610. Simply put, we find his professed ignorance on these points particularly unconvincing given that he obtained undergraduate and law degrees from prestigious universities and has been licensed to practice law since "either [19]65 or [19]66." App. at 508a.

In any event, we believe that the magistrate judge's finding that Berger engaged in discovery abuses plainly is

justified on this record. The magistrate judge had ample evidence of Berger's failure to cooperate, which in turn rendered his deposition a virtual non-event. Accordingly, we will affirm the monetary sanctions ordered pursuant to Rule 37(d).

IV. CONCLUSION

For the foregoing reasons, the district court's orders of August 10, 1999, and December 16, 1999, will be affirmed.

A True Copy:
 Teste:

        Clerk of the United States Court of Appeals
         for the Third Circuit

52