

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-30-2003

# Dinger v. Allfirst Fin Inc

Precedential or Non-Precedential: Non-Precedential

Docket No. 02-2804

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Dinger v. Allfirst Fin Inc" (2003). *2003 Decisions.* Paper 173.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/173

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 02-2804

———————

DENNIS L. DINGER;
KENNETH H. SALLADE,
Appellants

v.

ALLFIRST FINANCIAL, INC./ALLFIRST BANK
f/k/a Dauphin Deposit Corporation

———————————————

On Appeal from the United States District Court
for the Middle District of Pennsylvania
D.C. Civil Action No. 99-cv-01633
(Honorable Sylvia H. Rambo)

———————

Argued May 19, 2003

Before: SCIRICA, *Chief Judge*, NYGAARD and BECKER, *Circuit Judges*

(Filed October 30, 2003)

JONATHAN H. RUDD, ESQUIRE (ARGUED)
McNees, Wallace & Nurick
100 Pine Street
P.O. Box 1166
Harrisburg, Pennsylvania 17108-1166

Attorney for Appellants

BRIDGET E. MONTGOMERY, ESQUIRE (ARGUED)
Eckert, Seamans, Cherin & Mellott
213 Market Street, 8th Floor
Harrisburg, Pennsylvania 17101

      Attorney for Appellee

---

## OPINION OF THE COURT

---

SCIRICA, *Chief Judge*.

In this appeal from a grant of summary judgment for defendants, we address plaintiffs' state law claims of breach of fiduciary duty and negligent misrepresentation of material fact regarding the time period required to exercise plaintiffs' stock option plans. Plaintiffs' complaint invoked federal jurisdiction on the basis of diversity of citizenship. 28 U.S.C. § 1332(a).

### I.

Plaintiffs Dennis Dinger and Kenneth Sallade were employed by defendant Dauphin Deposit Corporation from the early 1980's through 1997. Dinger started as an assistant controller and rose to the position of chief financial officer. Sallade began as an assistant vice president in the controller's office and eventually became the company's chief investment officer.

In 1986, Dauphin Deposit instituted a plan to grant stock options to certain employees. As bank executives, plaintiffs participated in this stock option plan.

2

Significant for purposes of the opinion, the 1986 Plan contained language restricting the period of time during which an eligible employee could exercise his options following termination of employment. Specifically, the 1986 Plan stated:

> If . . . a Participant shall cease to be employed by the Company or an Affiliate (other than by reason of death or disability of the Participant), each Option shall remain exercisable for a period of three (3) months from the date of cessation of employment . . . to the extent it was exercisable at the time of cessation of employment, and thereafter all such Options shall terminate.

The 1986 Plan also provided that "[i]n the event of any merger or consolidation of the Company . . . all outstanding Options shall be deemed amended so as to permit the immediate exercise of all such Options."

In 1995, Dauphin Deposit adopted a separate stock incentive plan. Unlike the 1986 Plan, the time period for exercising options under the 1995 Plan was established in each individual grant. Until 1997, all options issued under the terms of the 1995 Plan provided that the right to exercise such options would terminate three months after the voluntary or involuntary termination of employment with the company or any of its subsidiaries. In 1997, Dauphin again issued options under the terms of the 1995 Plan; however, these options provided that they "may be exercised for a period of three (3) years after the voluntary or involuntary termination (other than by reason of retirement, death or disability) of your employment with the Company or any of its subsidiaries." The 1995 Plan also provided for the immediate vesting of all options upon a change in control of Dauphin Deposit. But the Dauphin Deposit Compensation Committee, charged

3

with administering the Plan, was authorized to "provide for an Option to be exercisable after termination of employment until its fixed expiration date."

Both Dinger and Sallade received substantial stock options during their employment with Dauphin Deposit. All the options at issue in this case were issued under either the 1986 Plan or under the 1995 Plan prior to 1997 (collectively referred to herein as "pre-1997 options"). At the time Dinger and Sallade learned of their impending terminations, they held 50,125 and 24,400 pre-1997 options, respectively.

On January 21, 1997, Dauphin Deposit's Board of Directors approved an agreement of merger with First Maryland Bancorp ("First Maryland"), a subsidiary of Allied Irish Banks, P.L.C. ("AIB"). On May 20, the shareholders approved the merger, and, on July 8, the merger was completed.[1] Under the terms of the merger, all stock options in Dauphin Deposit were converted into options to purchase AIB shares.[2] The exchange ratio of Dauphin Deposit options to AIB options was 1:1.

Fearing the loss of their jobs following the merger, both Dinger and Sallade sought the advice of George King, Dauphin Deposit's in-house counsel, regarding their rights as option-holders under the pre-1997 option terms. During a meeting on May 27, 1997,

[1]First Maryland's name was later changed to Allfirst Financial, Inc. ("Allfirst"), a defendant in this matter.

[2]Dinger and Sallade actually received options in AIB American Depository Receipts ("ADRs") in lieu of their Dauphin Deposit stock options, but the technical difference between ADRs and shares of stock is not material to this action. For the sake of simplicity, therefore, we will refer to the ADRs as stock, and the options in ADRs as "AIB options."

4

King advised Dinger and Sallade that, with respect to the options issued prior to 1997, all employees were required to exercise the options within three months "from the date of cessation of employment." Under King's interpretation, this included terminations resulting from a change in corporate control such as the merger with First Maryland. This was Dauphin Deposit's first merger, and King's interpretation was consistent with advice given when prior employees were terminated for other reasons. King also claims he advised plaintiffs to seek further advice from First Maryland representatives, a fact that plaintiffs dispute.

At the end of June 1997, Dauphin Deposit notified Dinger that the merger would result in his termination. Soon after, Sallade also learned he would be terminated. On July 18, 1997, aware of their impending terminations, plaintiffs exercised many of their stock options. Dinger performed a cash-less exercise[3] of all 50,125 of his pre-1997 options at a share price of $51.50, for a pre-tax gross income of more than $2.58 million. On the same date, Sallade exercised 16,400 of his options at the same price, for a pre-tax gross income of $844,600.

On August 29, 1997, plaintiffs resigned from their positions. Under the terms of their severance agreements, plaintiffs continued to receive compensation and certain benefits for a period of two years following their last date of active employment.

---

[3]In a cash-less exercise, the stock is immediately sold after the exercise of the options in order to pay the exercise price and all applicable taxes.

On September 26, 1997, Sallade exercised the balance of his 8,000 pre-1997 options at a share price of $53.00, grossing $424,000.

Although exercising their pre-1997 options, plaintiffs retained their 1997 options. According to the 1997 options' terms, plaintiffs had three years, rather than three months, from the "cessation of employment" in which to exercise these options.

Around this time, unbeknownst to plaintiffs, another stock option participant asked defendants whether the two-year period during which former employees were to receive severance compensation and benefits constituted employment under the terms of the stock option plans. In a memorandum dated September 15, Brian King, a First Maryland vice president (no relation to George King), responded to the inquiry with the following statement:

> In response to your recent inquiry, I have researched the question as to whether an officer's employment would be deemed to end at the last day worked or at the end of the severance or change in control period solely for the purpose of exercising stock options. After careful legal and accounting review, *it is possible for us to offer the more generous interpretation which would deem the severance period as employment.* This decision results in the following periods of time during which a person may exercise their options:
>
> > . . .
> > 2. Non-Qualified Stock Options granted prior to 1997 must be exercised within ninety (90) days after the last severance or change in control payment unless the option expires at an earlier date.
> > 3. Non-Qualified Stock Options granted in 1997 must be exercised within three (3) years of the last severance or change in control payment unless the option expires at an earlier date.

App. at 424a (emphasis added).[4]

Brian King arrived at this "more generous interpretation" based on his own analysis. There was no formal change in the stock option plans nor did Brian King consult with the Board of Directors or its Management Compensation Committee.

Several developments supported the finding of a more employee-favorable interpretation. As part of their severance packages, terminated employees, including Dinger and Sallade, continued to receive their full salary for two years following their last day of active employment.[5] First Maryland also continued to pay health, life, and other insurance benefits for two years. Finally, for pension plan and COBRA purposes, First Maryland terminated coverage two years after employees' last day of active employment.

On August 10, 1998, Dinger performed a cash-less exercise for 17,500 of his 1997 options at a share price of $98.00, grossing in excess of $1.71 million. Prior to the end of 1998, Sallade performed a cash-less exercise of 2,000 options at $92.125 and 3,000 options at $100.125, for a combined gross of $484,625. On February 2, 1999, defendants' stock peaked at $123.75.

---

[4]While Dinger already had exercised all of his pre-1997 options, Sallade was informed of the possibility of a more generous interpretation prior to his final cash-less exercise. On August 15, 1997, Sallade placed an open order to sell his 8,000 remaining pre-1997 options. On September 22, 1997, an Allfirst employee contacted Sallade and informed him of the possibility of a more favorable interpretation. Despite having received this information, Sallade chose to complete the cash-less exercise of the 8,000 options on September 26, 1997, when the stock price reached the pre-arranged open-order price.

[5] This was reported on a W-2 form that identified plaintiffs as employees.

Plaintiffs argue that George King gave them a "faulty" interpretation of the pre-1997 options' required exercise date, amounting to negligent misrepresentation of a material fact and a breach of fiduciary duty. Plaintiffs claim they would have retained their pre-1997 stock options had they been informed of the more "generous" interpretation. They do not seek damages based on the peak in the stock's price but instead on the 1997 share price of $98.00, alleging that they would have exercised all of their options at this price had they not relied on George King's interpretation of the 1986 Plan.

The District Court recognized that defendants owed plaintiffs a fiduciary duty based on the confidential relationship between George King and plaintiffs, but found no breach of that duty. The court also held that no reasonable fact finder could have found that King should have known of the alleged falsity of his "misrepresentation." The District Court granted summary judgment on plaintiffs' breach of fiduciary duty and negligent misrepresentation claims.

Our review of the entry of summary judgment is plenary. *Beers-Capitol v. Whetzel*, 256 F.3d 120, 130 n.6 (3d Cir. 2001). Summary judgment is proper where the record shows there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).

8

**II.**

Plaintiffs allege that defendants owed them a fiduciary duty to act with good faith and fair dealing. They further claim that defendants breached their duty when King failed to act in good faith by providing faulty advice on their stock option plans. The District Court held that "a knowledge disparity existed between Plaintiffs and Defendant with respect to the time frame [in which plaintiffs needed to exercise their stock options], which resulted in a confidential relationship and a corresponding fiduciary duty." *See also Young v. Kaye,* 279 A.2d 759, 763 (Pa. 1971) ("When the relationship between persons is one of trust and confidence, the party in whom the trust and confidence are reposed must act with scrupulous fairness and good faith in his dealings with the other and refrain from using his position to the other's detriment and his own advantage."); *In re Estate of Clark,* 359 A.2d 777, 781 (Pa. 1976) ("A confidential relationship exists . . . as a matter of fact whenever one person has reposed a special confidence in another to the extent that the parties do not deal with one another on equal terms, either because of an overmastering dominance on one side, or weakness, dependence or justifiable trust, on the other.") (citations omitted). Defendants do not dispute this holding on appeal, and we will assume that defendants owed plaintiffs a fiduciary duty based on a confidential relationship.

To establish a breach of fiduciary duty under Pennsylvania law, plaintiffs must prove: "(1) that the defendant negligently or intentionally failed to act in good faith and

9

solely for the benefit of plaintiff in all matters for which he or she was employed; (2) that the plaintiff suffered injury; and (3) that the agent's failure to act solely for the plaintiff's benefit . . . was a real factor in bring[ing] about plaintiff's injuries." *McDermott v. Party City Corp.*, 11 F. Supp. 2d 612, 626 n.18 (E.D. Pa. 1998).

At issue is whether defendants breached their duty to plaintiffs by failing to act in good faith. Pennsylvania law recognizes that a lack of good faith, or bad faith, may include "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Kaplan v. Cablevision of Pa., Inc.,* 671 A.2d 716, 722 (Pa. Super. Ct. 1996) (citing Restatement (Second) of Contracts § 205(d) (1981)); *see also Mountbatten Sur. Co. v. Jenkins,* 2003 U.S. Dist. LEXIS 4055, at *15 (E.D. Pa. Mar. 17, 2003). We noted in *Black Horse Lane Assoc., L.P. v. Dow Chemical Corp.,* 228 F.3d 275 (3d Cir. 2000), that a breach of good faith involves "a state of mind or malice-like element to breach of good faith and fair dealing, holding that the duty [of good faith] excludes activity that is unfair, not decent or reasonable, nor dishonest." *Id.* at 288-89.

Under this definition, there is no evidence that George King acted in bad faith when counseling plaintiffs on exercising their stock options. The 1986 Plan stated that "each Option shall remain exercisable for a period of three (3) months from the date of cessation of employment," while the 1995 Plan gave the Compensation Committee the

10

power to "provide for an Option to be exercisable after termination of employment until its fixed expiration date." King gave plaintiffs a reasonable interpretation of the plain language of the plans. He claimed that he referred plaintiffs to a First Maryland employee to obtain a second opinion, although this fact is in dispute. Nevertheless, there is no evidence that King intended to deceive plaintiffs. Furthermore, given the language of the plan and past practice, there is no evidence of negligence. The evidence cannot support a finding that King failed to act in good faith. We will affirm the grant of summary judgment on the breach of fiduciary duty claim.

**III.**

Plaintiffs also allege that George King's interpretation constituted a negligent misrepresentation of a material fact. The Restatement defines negligent misrepresentation as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552(1) (1977). Pennsylvania law has adopted this definition. *See Bortz v. Noon*, 729 A.2d 555, 561 (Pa. 1999); *Gibbs v. Ernst,* 647 A.2d 882, 890 (Pa. 1994).

The threshold inquiry is whether George King supplied "false information" to plaintiffs. King offered his interpretation of the stock option plans to plaintiffs based on

11

the plans' plain language and the company's past practice. There is no evidence that this interpretation was "false." Moreover, Allfirst's later, more generous interpretation does not make George King's interpretation untrue.

The Pennsylvania Supreme Court has set a lower threshold for negligent misrepresentation than for intentional misrepresentation. *See Bortz,* 729 A.2d at 561 ("[T]he elements of negligent misrepresentation differ from intentional misrepresentation in that the misrepresentation must concern a material fact and the speaker need not know his or her words are untrue, but must have failed to make a reasonable investigation of the truth of these words."). But the initial requirement is that the words at issue must be untrue. Because there is no evidence in the record that King's interpretation was false, plaintiffs cannot establish a claim for negligent misrepresentation.

**IV.**

For the foregoing reasons, we will affirm the judgment of the District Court.

TO THE CLERK:

Please file the foregoing opinion.

/s/ Anthony J. Scirica
*Chief Judge*

DATED: October 30, 2003

*Dinger, et al. v. AllFirst Financial, Inc.,etc.,* No. 02-2804

Becker, *Circuit Judge*, dissenting. /s/ Edward R. Becker

I agree with the majority that George King did not act in bad faith. I cannot agree

that he was not negligent, even under a low threshold. In my view there is a genuine

issue of material fact as to whether King was in fact quite negligent in failing to do any

research into the effects a change-in-control agreement might have upon the period in

which a participant is required to exercise his options. More specifically, the record

demonstrates that King performed no research, legal analysis or investigation into

whether the two-year period in which Dinger and Sallade continued to receive salary,

pension benefits, and health benefits could be considered "employment".

This failure is especially problematic in view of the fact that, even before the

change in control, as King knew, Dinger and Sallade were to be treated as employees for

13

pension and health benefit purposes. Thus there is, I believe, a genuine issue of material fact as to whether Dinger and Sallade believed that a reasonable investigation on King's part would have led to the same conclusion that he reached later that year after "careful legal and accounting review." (424a). Indeed, in discussing the reasoning behind this later decision, King testified:

> Q. Then you set forth the results of your determination. Did you believe that this was a new interpretation of the plan or plans, I should say?
>
> A. No, I think that this was an interpretation or a confirmation that was consistent with other decisions we made that a severance period counted as employment. We had made that decision with regard to the qualified pension plan, for example, so this was a decision that was consistent with our previous decisions on employment status. It was a case of applying that decision process to the wording in the stock option agreements that gave a consistent definition for "termination."
>
> I respectfully dissent.